[No. B042848. Second Dist., Div. Six. July 13, 1990.]

In re the Marriage of PAMELA M. and MICHAEL J. FINGERT.
MICHAEL J. FINGERT, Respondent, v.
PAMELA M. FINGERT, Appellant.

COUNSEL

Jon W. Davidson, Carol A. Sobel, Paul L Hoffman, Christine A. Littleton, Grace Ganz Blumberg and Sheila James Kuehl for Appellant.

Taylor, McCord, Johnson, Conroy & Praver and Richard L. Taylor for Respondent.

## OPINION

**ABBE, J.**—Must the the mother of a six-year-old child, who is the primary custodial parent, be required to relocate to the area where the father resides to facilitate his visitation or lose custody? No.

Pamela Fingert (Pamela) and Michael Fingert (Michael)[1] were married on November 13, 1980, and lived in Ventura County. They separated approximately nine months later when Pamela was pregnant. Michael filed a petition for dissolution of the marriage on December 28, 1981. Their son Joshua was born on February 1, 1982. In January 1983 Pamela and Michael executed a marital settlement agreement in which they agreed to joint legal custody, with actual physical custody to Pamela, and reasonable visitation rights to Michael. The interlocutory decree was entered making orders in accordance with the agreement.

During Joshua's first year of life, he and Pamela lived in Ventura. She decided to relocate to Chicago, Illinois where her family resided. Michael sought and obtained an ex parte restraining order temporarily enjoining Pamela from moving. Pamela changed her plans and relocated to San Diego. The custody order was modified to provide that Pamela was to have physical custody of Joshua except for alternate weekends and certain summer and holiday periods, when the child was to be with Michael. Pamela obtained employment in San Diego in the computer industry and lived there for approximately 18 months. During that period, both Pamela and Michael would drive approximately 100 miles to a half-way point between Ventura and San Diego to exchange Joshua to implement the custody agreement.

Pamela accepted a better job which required her to move to San Mateo County. Pamela and Michael, through their attorneys, agreed to an informal modification of the visitation schedule. Michael had Joshua approximately one week per month. Joshua was met by one of his parents at both ends of his flights between the San Francisco and Los Angeles areas.

Pamela's father was ailing and wanted to retire from his small publishing business located in Chicago. He asked Pamela to take over the business. Pamela petitioned the court for permission to move to Chicago to take over this business. This request was denied but the court confirmed the informal arrangement agreed upon by the parents by ordering that Michael would have visitation from the second Friday to the third Saturday of each month

---

[1] Hereinafter we refer to them by their first names for convenience and not out of disrespect.

and during certain summer and holiday periods. Joshua was now in kindergarten, and the arrangement meant he would attend one school for three weeks and another for one week each month.

Pamela became concerned about how this arrangement was affecting Joshua and how it would affect him when he started first grade. In April 1988 she filed a motion to modify the custody order to provide for visitation to Michael consistent with Joshua's school schedule. Pamela's suggestion was that Michael have Joshua on weekends, holidays and during the summer. The parties were ordered to and did meet with a court mediator and a hearing was eventually set for September 12, 1988, by which time Joshua had already begun first grade in San Mateo County.

Michael filed a responsive declaration to Pamela's motion in which he suggested that "the optimum living arrangement for my six year old boy is for he and his mother to move back into the County of Ventura, allowing Joshua 50 percent time in each home while being a student at only one school." In the alternative, Michael suggested that Joshua live with him for one year and with Pamela the next.

In response Pamela argued that requiring Joshua to move to Ventura would not be in his best interests, that he attended the same school in San Mateo County for three years, he was enrolled in his second year in a Sunday school and had participated on the same soccer team for years and has had the same set of playmates ever since he was three years old. She contended that Joshua's "roots" were in San Mateo County.

On September 12, 1988, the court heard testimony from Pamela, Michael and Robert L. Beilin, Ph.D., the director and senior mediator of the family relations department on the Ventura County Superior Court.

The court mediator testified that he had met with Pamela and Michael, alone and together, and had spent some time with Joshua. He recommended that because of "the significance of father and son relationship," Michael should be allowed to continue to see Joshua on a regular basis and that "neither a weekend father arrangement, nor paternal visitation during holidays and vacations was the best situation." He felt that "it would be best if Joshua and [Pamela] moved to Ventura in order to make it easier for [Michael] and Joshua to continue to spend time together regularly." He recommended that the court order Pamela to move back to west Ventura County.

Michael testified that he and his son needed to be together because they are father and son and that he and Joshua are very close and their time

together is extremely important to them both. Pamela's testimony centered on the ties they had in San Mateo County. She objected to the dislocation in her own life if she and Joshua were ordered to move to Ventura County as recommended by the mediator.

The mediator testified that in considering whether Pamela should move instead of Michael, he was "swayed by the fact [Michael] owned a home and 10 year old business in Ventura and offered to help [Pamela] move to Ventura County whereas [Pamela] had only launched [her business] in the San Francisco bay area in the last year, did not have substantial financial ties there, and was not financially in a position where she could meet [Michael's] offer and assist him in relocating."

The trial judge stated that he felt there were " . . . strong equities both ways" and that he considered granting summer custody to Michael and ordering Joshua to continue to spend the school year with Pamela in Northern California. However, the judge explained that he had faith in the court mediator and would follow his recommendations. He ordered that "[t]he minor's residence shall be in Ventura County and shall not be changed from said county without order of this court or written agreement signed by both parties . . ." and that Michael "financially assist [Pamela] in moving back to West Ventura County at a cost not to exceed $1,000.00 in connection with moving expenses."

The court acknowledged that its order would "force [Pamela] to Ventura County or else give up custody of her child." He stated it would not make sense to have Michael move because of Michael's "long-standing roots in business in Ventura and his greater ability financially to help [Pamela] relocate."

## I.

We follow the usual rule on appeal enunciated by the Supreme Court in *Burchard* v. *Garay* (1986) 42 Cal.3d 531 [229 Cal.Rptr. 800, 724 P.2d 486, 62 A.L.R.4th 237], that a trial court decision shall not be overturned unless an abuse of discretion is manifest. We find such an abuse of discretion here.

We disagree with the language of the court in *In re Marriage of Birnbaum* (1989) 211 Cal.App.3d 1508 [260 Cal.Rptr. 210], that ". . . if parents with joint physical custody are unable to modify residential arrangements for their children and call upon the court to do so, they have no basis to complain about the decision that is made." (*Id.*, at p. 1518.) It must be acknowledged that all litigation is brought about by those who are unable to

settle their disputes. We do not choose to chastise parents who fail to make mutually agreeable coparenting residential arrangements by suggesting that, by such failure, they will have to accept whatever decision a trial court decides. We shall adhere to the standard of review announced by the Supreme Court.

## II.

This appeal is based on a settled statement under California Rules of Court rule 7. The settled statement sets forth in narrative form the testimony of the parents and the court mediator, the only witnesses at the hearing. It also included the court's decision and the judge's statement of reasons for the decision. The purpose of a settled statement is to provide the appellate court with an adequate record from which to determine contentions of error. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1296 [240 Cal.Rptr. 872, 743 P.2d 932].) The settled statement provides such a record here.

Under the circumstances, we reject Michael's contention that we must presume that the trial court found all facts necessary to support the judgment as there is no statement of decision. In the case relied upon by Michael for this proposition, *In re Marriage of Ditto* (1988) 206 Cal.App.3d 643 [253 Cal.Rptr. 770], there was not only no statement of decision, but the judgment was without any explanation with respect to the court's reasoning. There is no lack of explanation here.

## III.

■ The effects of the order appealed from here are breathtaking. The primary concern in a custody dispute is the best interests of the child. (Civ. Code, § 4600.) There is not the slightest hint that Pamela is not a capable, caring and competent parent. There is no evidence that it would be in the best interests of the child if custody was removed from her and given to Michael. The court determined that the way to accomplish Michael's wish to have his son at least one full week per month was to order the child's place of residence to be Ventura County. Should the mother fail to move, she would lose custody. There was not even a provision in the order for visitation by Pamela if she chooses, for whatever, perhaps compelling reason, to not move.

The court mediator testified it would not be in Joshua's best interest to sever his contacts with his mother.

A court may not decide a custody issue on the basis of the relative economic position of the parties. (*Burchard v. Garay, supra,* 42 Cal.3d at p.

535.) The Supreme Court pointed out in *Burchard* that a trial court "abuses its discretion" and "must be reversed" if it "[bases] its decision upon the relative economic positions of the parties . . . ." (*Id.*, at p. 541.)

The court further explained, "comparative income or economic advantage," including consideration of one parent's "better economic position" or "home ownership," is "not a permissible basis for a custody award." (42 Cal.3d at p. 539.)

The trial court here improperly based its decision on such factors. It expressly relied on Michael's superior economic position. Such a factor improperly presumes that children should live in the community of the parent who is wealthier. This factor has nothing to do with the best interests of the child.

As noted in *Sail'er Inn* v. *Kirby* (1971) 5 Cal.3d 1, 19, footnote 19 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351], women are more likely to be unemployed than men and, when they are employed, earn less, regardless of race or level of education. Any rule based on the relative wealth of parents will almost invariably favor men. Such a ruling has the effect of discriminating against women.

If it is an abuse of discretion to base a custody decision on the race of a custodial parent's second spouse (*Palmore* v. *Sidoti* (1984) 466 U.S. 429 [80 L.Ed.2d 421, 104 S.Ct. 1879]), on physical disability (*In re Marriage of Carney* (1979) 24 Cal.3d 725, 728 [157 Cal.Rptr. 383, 598 P.2d 36, 3 A.L.R.4th 1028]), on sexual orientation (*Nadler* v. *Superior Court* (1967) 255 Cal.App.2d 523, 525 [63 Cal.Rptr. 352]), or on religious belief (*In re Marriage of Murga* (1980) 103 Cal.App.3d 498, 505 [163 Cal.Rptr. 79]), a decision based on relative financial conditions certainly must be considered an abuse of discretion.

■ Courts cannot order individuals to move to and live in a community not of their choosing. To attempt to do so is inconsistent with both the federal and California Constitutions. The United States Supreme Court has inferred a right to travel from various constitutional provisions. This right also protects the right of individuals "to migrate, resettle, find a new job, and start a new life." (*Shapiro* v. *Thompson* (1969) 394 U.S. 618, 629 [22 L.Ed.2d 600, 612, 89 S.Ct. 1322].)

"The right to intrastate travel . . . is a basic human right protected by the United States and California Constitutions . . . . Such a right is implicit in the concept of a democratic society and is one of the attributes of personal liberty under common law." (*In re White* (1979) 97 Cal.App.3d

141, 148 [158 Cal.Rptr. 562].) "A citizen has a basic constitutional right to intrastate as well as interstate travel." (*People* v. *Beach* (1983) 147 Cal.App.3d 612, 622 [195 Cal.Rptr. 381].)

 Pamela cannot be ordered to choose between her right to resettle, find new employment, start a new life and retain custody of her child. Appellate decisions in California that have approved restrictions upon a custodial parent's choice of domicile have arisen only where the parent moving does so with an intent to frustrate or destroy the other parent's custody or visitation rights. Where a custodial parent sought permission to relocate, such permission has sometimes been denied when such relocation was found to be motivated by an intent to interfere with the other parent's custody or visitation rights or not to be in the children's best interests. (*Gudelj* v. *Gudelj* (1953) 41 Cal.2d 202, 208-209 [259 P.2d 656].) There is no justification for the order requiring Pamela to either relocate or lose custody.

We find the trial court abused its discretion.

The order appealed from is vacated. Appellant to recover costs on appeal.

Stone (S. J.), P. J., and Gilbert, J., concurred.

Respondent's petition for review by the Supreme Court was denied September 26, 1990.