[No. B067194. Second Dist., Div. Four. Sept. 20, 1993.]

In re the Marriage of CLINTON H. and LAURIE KEIKO ROE.
LAURIE KEIKO COOPER, Respondent, v.
CLINTON H. ROE, Appellant.

## COUNSEL

Bernard Silverman, Vandenburg, Newell, Curtis, Nelson & Schuur and Pamela Bourette Schuur for Appellant.

Lichtig, Ellis & Meyberg and Leonard J. Meyberg, Jr., for Respondent.

## OPINION

**WOODS (A. M.), P. J.**—Clinton Roe appeals a custody order permitting his former wife, Laurie Keiko Cooper (Keiko), to remove their son, M., from the state.

We review the evidence in the light most favorable to the order. (*In re Marriage of Carlson* (1991) 229 Cal.App.3d 1330, 1337 [280 Cal.Rptr. 840].)

The parties separated in January 1988, when M. was four years old. Keiko took M. and moved into a house owned by her mother. For approximately a month there was no contact between M. and his father. At the custody trial, Keiko testified that at the time of the separation, she feared for her own safety and that of her son.

In February 1988, the parties entered into an oral agreement whereby they shared custody of M. In June 1988, Keiko was visited by Linda Smith from the department of children's services (DCS). She told Keiko that she had received a report that M. was being abused by his father. Keiko had not made the report nor did she know of any basis for such a report. The information was provided to Smith by Dr. Doris DeHardt, a therapist whom Keiko had been seeing. Smith told Keiko that unless she obtained a restraining order against visits by Clinton, M. would be placed in a foster home. A restraining order was issued on August 10, 1988, preventing Clinton from taking M. on a 10-day vacation and limiting him to monitored visitation.

DCS filed a petition in dependency court on September 13, 1988. The petition was eventually dismissed. Sometime thereafter, Clinton filed a civil suit against Keiko alleging that Keiko had made "slanderous statements" in connection with the DCS proceeding. During the pendency of the civil action, Clinton wrote several letters to Keiko urging her to settle the case. In one letter he wrote, "If this matter is not resolved I am putting you on notice that absent any legal prohibition that I will hand distribute the following to any and all prospective witnesses which will include your immediate family, extended family and cousins, personal friends and anyone else who is

appropriate; [¶] a complete itemization of the motions you have filed in this matter to show your desire to suppress information and a statement to that effect. . . . If Keiko didn't do what she is accused of [i.e., initiating the DCS investigation] why is it necessary to suppress statements and writings? [¶] [A] [c]opy of communication from therapists showing you had a problem with [M.] and not me. [A]nd other items." After three years, the civil suit was settled.

In March 1989, the parties entered into a joint custody agreement. On July 12, 1991, Clinton filed an ex parte application for modification of the custody order to prevent Keiko from removing M. from California. On July 16, 1991, Keiko filed her own order to show cause for modification of the custody order. She sought an order permitting her to take M. to Huntsville, Alabama with her new husband, Basil, and his two daughters, Susan and Dawn. In her declaration, Keiko stated that her husband had been out of work in the aerospace industry for the preceding nine months, but had found employment in Hunstville. She averred, "My husband has decided to accept this employment rather than remain unemployed since the lack of additional finances materially affects our standard of living, among other factors."

The matter came to trial on January 22, 1992, and trial lasted 11 days. Additional facts will be set forth in the text of this opinion as necessary to our discussion. The trial concluded with an order of joint custody of M. to his parents, with primary custody to reside in Keiko. The court permitted her to take M. with her to Huntsville, Alabama. The order also specified the periods of time when Clinton would have custody of M.

In support of its custody order, the court issued a lengthy statement of decision. The court assumed that, "[Clinton] has no burden to prove detriment to [M.] to prevent his removal." It then found: "[Clinton's] conclusion that [Keiko's] move was to interfere with his relationship with [M.], and was a continuation of [her] long-standing policy of attempting to thwart and interfere with that relationship is unfounded." Regarding the DCS investigation, the court "fails to find there is any evidence that [Keiko] was the impetus behind, and/or the person responsible for, causing or sustaining that investigation and its resultant impact on [Clinton's] time with [M.]." The court found that Clinton had not abused M. ". . . but the Court also believes there was substantial question by a number of social workers and psychologists as to whether or not [M.] had been molested or in some ways there had been some type of problem."

The court found that Keiko had been M.'s primary caretaker and that he had a close and bonded relationship with her "such that it would be in his

best interest to maintain that relationship and it would be to his detriment not to do so." The court found that geographic stability was not a determinative factor in deciding M.'s best interest because whatever its decision "[M.] would have to change residences and schools, he would have to visit the other parent, and would be away from one parent for substantial periods of time."

The court found that Keiko "had insight to [*sic*] and was aware of [M.]'s emotional and psychological problems as early as 1988, was willing to work to solve and correct those problems, recognized the deficiencies she may have had in her ability to parent [M.], and likewise made substantial efforts to correct them." The court found that Clinton, by contrast, while "a kind, capable and loving parent" had not been shown by the evidence to have "parenting or emotional skills [that] are so much more advanced than [Keiko's] [so] that it would be in [M.]'s best interest to have a primary relationship with [him]."

The court found that Clinton's refusal to acknowledge that M. may have been the victim of some type of molestation, "demonstrates a substantial and pervasive inability to recognize [M.]'s emotional and psychological needs, an attitude that has continued over a lengthy period of time." The court also found, because of Clinton's continuing anger at Keiko over the DSC investigation, ". . . he would be much less likely to support and encourage frequent and continuing contact with [Keiko], should he have primary custody, and to support and encourage M.'s relationship with [her]." The court cited evidence by way of written statements by Clinton in which he proposed, for instance, that should he have custody of M., Keiko would have no more than four consecutive weeks of custody in the summer while, should she have custody, he would have at least eight weeks of summer custody and generous visitation at Easter and Christmas. The other statement Clinton prepared purported to list reasons why he should have custody rather than Keiko. The list of reasons in his favor consisted of two single-spaced, typed pages, but he wrote only a single reason in her favor. Based on this and other evidence, the court stated it "does not believe [Clinton's] contention that he would support that relationship [between M. and Keiko]."

The court cited Clinton's civil action against Keiko as evidence of his vindictiveness and animosity toward her particularly his "threats . . . to convince her to settle, represented by the various correspondence he had with [her] . . . particularly where he threatened to disseminate material to [her] family . . . ."

The court characterized Clinton as "rigid and unbending, unlikely to encourage in [M.] the freedom to be 'his own person' . . . . The Court feels

that [Keiko] is much more likely to be encouraging to [M.] developing his own interests and 'persona'." The court cited evidence of Keiko's that showed her parenting skills were "far superior to that of [Clinton]." The court concluded: "It is very important and in [M.]'s best interest that he maintain the relationship he has with [Keiko]." Finally, the court rejected the recommendation of the court-appointed evaluator, Dr. Robin Drapkin, who testified that Clinton should have primary custody of M.

Clinton appeals the order. We affirm.

## I

We begin by stating the issue in this appeal: Whether the court's order placing primary custody of M. with Keiko based on its finding that such custody was in M.'s best interests is supported by substantial evidence so as to constitute a rational exercise of the court's discretion.

■ The standard of review for custody orders is well settled. "Reversal is justified only for abuse of discretion. [Citation.] The reviewing court must consider all the evidence, draw all reasonable inferences, and resolve all evidentiary conflicts, in a light most favorable to the trial court's ruling. [Citation.] The precise test is whether any rational trier of fact could conclude that the trial court order advanced the best interests of the child. [Citation.]" (*In re Marriage of Carlson, supra,* 229 Cal.App.3d at p. 1337.)

Relevant to our review is the public policy preference set forth in Civil Code section 4600, subdivision (a) of assuring minor children continuing contact with both parents after separation or dissolution. This preference, however, is qualified by subdivision (d) which states that the section "establishes neither a preference nor a presumption for or against joint legal custody, joint physical custody, or sole custody, but allows the court and the family the widest discretion to choose a parenting plan which is in the best interests of the child or children." (Civ. Code, § 4600, subd. (d).)

Finally, where, as here, the appellant's claim is that substantial evidence fails to support an order of the trial court, our task is to determine whether any substantial evidence exists in support of the order. Where there is conflicting evidence, the evidence that supports the order is accepted as true, and that evidence which is unfavorable is discarded. The trial court's determination of credibility is binding on this court. We may neither reweigh the evidence nor reevaluate the credibility of witnesses. (*In re Marriage of Leff* (1972) 25 Cal.App.3d 630, 641 [102 Cal.Rptr. 195]; *Stokus* v. *Marsh* (1990) 217 Cal.App.3d 647, 656 [266 Cal.Rptr. 90]; *Ross* v. *Lawrence* (1963) 219 Cal.App.2d 229, 232-233 [33 Cal.Rptr. 135].)

Clinton argues that there is a different standard of appellate review than whether a custody order is in the best interests of the child. He maintains that where a move is involved, it must be shown that the move is essential or expedient to the child's welfare and undertaken for an imperative reason. He draws this language from *In re Marriage of McGinnis* (1992) 7 Cal.App.4th 473, 479 [9 Cal.Rptr.2d 182].)

*McGinnis* also involves an order permitting the mother of minor children to move her children away from her former husband to join her second husband, but there the resemblance ends. The trial court in *McGinnis* made its order based on declarations, without live testimony and without an independent evaluation of the best interests of the children despite the father's request for such an evaluation. The trial court's failure to conduct a hearing and evaluation was the basis of the appellate court's reversal of the order. The court said in " 'move away' cases where a shared parenting arrangement is working, an order changing custody should be made only after adequate notice, a meaningful mediation, and the parents have been given the opportunity for an outside evaluation. As indicated, a change of custody is the exception, not the rule. It can be made only for an 'imperative reason.' " (7 Cal.App.4th at p. 481.)

We have no quarrel with the first part of this proposition: there should be a meaningful hearing where one parent proposes to remove minor children from the geographical area where both parents reside. In this case, that requirement was complied with. Not only was an outside evaluation made of the parents, but they were permitted to present their cases exhaustively. Thus, the procedural requirement articulated in *McGinnis* was satisfied here.

■ Civil Code section 4600, subdivision (d) gives the court the "widest discretion" in choosing a parenting plan that promotes the best interest of the child. As to the suggestion in *McGinnis*, derived from dicta in cases involving change of custody, that when a custodial parent seeks to move the children he or she must prove the move is expedient, essential or imperative (*In re Marriage of McGinnis, supra,* 7 Cal.App.4th at p. 479), we reject this language as inconsistent with the statute as it tends to curb or limit the discretion of the trial court.[1]

We also reject Clinton's contention that the trial court erroneously placed on him the burden to prove the move was detrimental to M. rather than on

---

[1]Clinton also refers to three other "move away" cases in which the Court of Appeal affirmed the trial court's orders preventing the parent from removing the children from the geographical area in which the other parent resided. (*In re Marriage of Rosson* (1986) 178 Cal.App.3d 1094 [224 Cal.Rptr. 250]; *In re Marriage of Fingert* (1990) 221 Cal.App.3d 1575 [271 Cal.Rptr. 389]; *In re Marriage of Carlson, supra,* 229 Cal.App.3d 1330.) Factually, these cases are quite different from the case before us and, are, therefore, distinguishable. They,

Keiko to prove that it was in M.'s best interest. (*In re Marriage of McGinnis, supra,* 7 Cal.App.4th at p. 479.) The statement of decision clearly states that father had no burden to prove detriment to M. The record demonstrates that the burden was on Keiko to prove the move to Alabama was both necessary to her and would have no detrimental effect on M. or his relationship with his father and that it was in M.'s best interests.

■ Turning to the substantial evidence question, Clinton's entire argument is based on the testimony of Dr. Drapkin, who opined that M.'s best interest would be served by permitting him to remain in California. All of the contrary evidence is ignored, including the fact that the trial court rejected Dr. Drapkin's recommendation.

The trial court determined that permitting Keiko to maintain primary custody of M. was in his best interests because she had been his primary caretaker, her parenting skills were superior to Clinton's and, unlike Clinton, she would not attempt to thwart M.'s relationship with his noncustodial parent. These findings are amply supported by the evidence.

By example, Keiko testified to her involvement with M.'s education: she had been a room mother at M.'s school, and a Monday mom which involved her assisting the teacher in the classroom every Monday. She helped M. with his schoolwork, particularly with his reading skills. She testified that she had never made any effort to undermine M.'s relationship with his father, nor was the purpose of the move to Alabama to thwart Clinton's visitation rights. Further, she testified that she enjoyed a good relationship with her current husband and that she had sought the help of a therapist in order to blend his family and hers into a single family. She testified that M. got along both with his stepfather and his stepsisters.

Dr. Molly Peukert, the therapist with whom Keiko had consulted, also testified. Dr. Peukert had been counseling Keiko's stepdaughters prior to her marriage to Basil, because the two girls suffered from learning disabilities. After the marriage, she saw the entire family, including M. "to facilitate the blending of the two families." She testified that, in relation to her stepdaughters, Keiko was "very willing and open to any instruction in terms of the types of strategies I felt would be necessary in order to create more cohesion in the home." She also testified that Keiko was able to give clear direction to M., was affectionate with him and that they conversed easily. She found Keiko not only to be open in terms of imposing appropriate discipline but consistent in her actions. She testified that as to all the children Keiko communicated effectively, providing clear directions and repeating or explaining her directions if the child failed to understand. In her opinion, M. had integrated into his new family.

---

nonetheless, support the rule that a trial court's determination of this issue should be affirmed absent a clear showing of abuse of discretion.

By contrast, substantial evidence supported the court's conclusion that Clinton was more likely to attempt to thwart M.'s relationship with his mother because of his anger arising from the DSC investigation into possible abuse and his unresponsiveness to the possibility that some abuse had occurred.

For example, even after DCS worker Linda Smith testified that the investigation had not been initiated by mother, Clinton testified to his continuing belief that Keiko was in some way behind the investigation. He also continued to believe that Keiko had a long-standing campaign to thwart his visitation in the absence of any evidence to support that belief. His vindictive and angry attitude toward Keiko was also evidenced by his filing of the civil action against her and the letters he wrote in an attempt to coerce a settlement. Clinton's attitude was also demonstrated by two documents he submitted to the court-appointed evaluator. One, which set forth his notion of appropriate visitation, was skewed entirely in his favor. The second list purported to set forth reasons supporting custody with either of the parents. The reasons he submitted for placing custody of M. with him consisted of two single-spaced typewritten pages, while the only reason he provided for M. living with Keiko was "Continuous contact with his mother."

Furthermore, despite Linda Smith's testimony that she believed, based on her observations of his behavior, there was a possibility M. had been molested, Clinton preferred to believe that any disturbances in M.'s conduct were due to Keiko's bad parenting skills. Additionally, Dr. Alex Caldwell, who testified as an expert on analysis of the results of a psychological profile test (the Minnesota Multiphasic Personality Inventory (MMPI)), concluded from Clinton's test that he was rigid and withholding and would have difficulty in forgiving and forgetting where he believed he had been wronged.

Ignoring all of this evidence, Clinton relies on the testimony of Dr. Robin Drapkin, the court-appointed evaluator, whose recommendation that it would be in M.'s best interests to remain in California with Clinton, was rejected by the trial court.

We conclude that substantial evidence supported the trial court's decision that M.'s best interests would be served by allowing Keiko to retain primary custody of him.

## II

We briefly address Clinton's remaining claims.

Clinton argues that the court failed to consider or rule upon his order to show cause seeking primary physical custody of M. The argument is without merit in view of the 11-day trial, the purpose of which was to decide in which parent's custody M.'s best interests would be served.

Finally, Clinton argues that he was denied equal protection of the laws because the trial court's decision was based on the parties' relative economic positions, citing *Burchard* v. *Garay* (1986) 42 Cal.3d 531 [229 Cal.Rptr. 800, 724 P.2d 486]. In *Burchard*, custody was awarded to father because of his economic status. The Supreme Court reversed the order, commenting: "[C]omparative income or economic advantage is not a permissible basis for a custody award." (*Id.* at p. 539.) We agree, but in the case before us the principle is irrelevant as the court's order was not based on the parties' comparative wealth. The court did find that the parties were sufficiently affluent to be able to afford the expense of transporting M. back and forth between Alabama and California, and Clinton does not argue that the court was incorrect in its finding. There was no other reference to comparative wealth, and Clinton's equal protection claim is totally without merit.

Keiko's request for sanctions is denied. Although some of the issues raised were frivolous, the appeal is not totally without merit. (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637 [183 Cal.Rptr. 508, 646 P.2d 179].)

The order is affirmed. The request for sanctions is denied. Keiko to have her costs on appeal.

Vogel (C. S.), J., and Soven, J.,* concurred.

*Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.