Filed 5/12/14  Marriage of Schmitz CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of VICTORIA ANN and ERIC PAUL SCHMITZ. | D064500 |
| VICTORIA ANN SCHMITZ, | |
| Appellant, | (Super. Ct. No. D499620) |
| v. | |
| ERIC PAUL SCHMITZ, | |
| Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, William H. McAdam, Judge.  Affirmed.

Donald R. Holben & Associates and Amelia A. McDermott for Appellant.

No appearance for Respondent.

Victoria Schmitz (mother) appeals from the court's order (1) granting Eric Schmitz (father)[1] sole legal and physical custody of their son Ryon, who at the time of the issuance of the order was almost 16 years old; (2) premising mother's visitation with Ryon on terms mutually agreed to by her and Ryon; and (3) granting mother and father joint legal and physical custody of their son Craig, who at the time was 11 years old, with the provision that if mother and father cannot "make joint decisions concerning school selection and extra-curricular activities, the Father/Petitioner shall have the right to make the final decision."  Affirmed.

BACKGROUND

Mother and father were married in 1997, separated in 2006 and divorced in early 2009.  As noted, they had two children during their marriage, Ryon and Craig.

The record shows that after they separated, mother and father were able to resolve their custodial timeshare issues without court intervention.  Initially, father had custodial time with the boys on alternate weekends from Friday through Monday and on every Monday overnight.  However, in late October 2008, father filed an order to show cause to reduce his spousal and child support.  In addition, he requested equal custodial time with the boys, based on the boys' request to spend additional time with him.  Mother opposed

---

1    Father has not filed a brief in this appeal.  However, "we do not treat the failure to file a respondent's brief as a 'default' (i.e., an admission of error) but independently examine the record and reverse only if prejudicial error is found."  (*Kennedy v. Eldridge* (2011) 201 Cal.App.4th 1197, 1203, citing *In re Bryce C.* (1995) 12 Cal.4th 226, 232-233 and *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, 1078, fn. 1; compare *In re Bryce C.*, at p. 232 ["If an *appellant* fails to file a brief, the appeal may be dismissed entirely"].)

2

the request but, ultimately, in December 2008, mother and father entered into a stipulation adopting the recommendations of the family court services that they share joint legal custody; that the boys' primary residence was with mother; and that physical custody would be apportioned 66 percent to mother and 34 percent to father.

In September 2009, father again moved to modify spousal and child support and to modify visitation to allow him to have the boys on alternate weekends and to have mid-week visits. As a result, mother and father agreed to attend mediation regarding custody issues and visitation plans. The mediator subsequently recommended a 2-2-3 schedule (i.e., one parent would have the boys for two days, the other parent would have the boys for the next two days and then the boys would go back to the first parent for three days, with the parents alternating the three days), that was similar to the plan previously proposed by father.

In February 2010, father moved to modify spousal and child support and to modify custody to have full custody of the boys with mother having alternate weekends. As relevant here, father claimed in support of his request that mother was making it increasing difficult to plan "reasonable extracurricular activities" for the boys and that the boys wanted to be involved in such activities but mother refused.

Although mother initially opposed father's motion to modify, mother and father ultimately stipulated to adopt the recommendation of a private mediator that they have joint legal custody of the boys with a 2-2-3 schedule for physical custody. In the stipulation, mother and father agreed to appoint a new mediator, Stephen Doyne, Ph.D.,

3

to help them resolve any future custody issues between them. The stipulation provided that before an issue was to be submitted to Dr. Doyne for resolution, "the parties shall make good-faith and reasonable efforts to reach a resolution. Only after those efforts have failed, shall they contact Dr. Doyne for a mediation session(s)."

As relevant here, in December 2010 father again sought a custody modification. In his declaration in support of his request that he be given legal custody of the boys, he stated the 2-2-3 program is "great," but he and mother could "not communicate in any way for what is in the best interest for the boys" and mother continues to "deny every request" for them to be "more engaged in sports and other extracurricular activities." Father noted he had hoped that with equal time sharing the issues between him and mother would be resolved but, in fact, the opposite had occurred. He asked the court to look at the issue from the perspective of "their [i.e., the boys] time" as opposed to "Mom's time" or "Dad's time," inasmuch as the boys "are only children once . . . ."

Mother in response filed, among other documents, Dr. Doyne's December 10, 2010 report in which he recommended that the boys play the sports they prefer (which the record shows mother had somewhat opposed) and that each parent be present during their custodial time but not at the same time to avoid any confrontation between mother and father. Dr. Doyne also recommended father stop putting the boys "in the middle" of issues between mother and father.

4

In March 2011, father moved for the removal of Dr. Doyne and the appointment of minor's counsel for the boys. With respect to Dr. Doyne, father noted that he could not afford to pay Dr. Doyne; that the costs of Dr. Doyne's services had exceeded $10,000; and that mother went directly to Dr. Doyne to resolve what father contended was the "simplest of parenting issues" rather than attempt to work them out with father first as required by their agreement. Father asked all future mediation between him and mother be done through family court services.

With respect to the boys, father attached two writings from Ryon in support of his contention that mother did not allow the boys to participate in activities of their choosing "unless on her terms"; and that the appointment of minor's counsel was appropriate because the boys each needed "a voice in regards to [their] own needs and wants [as] developing young men."

After both mother and father filed additional paperwork, the court in mid-April 2011 denied father's request both, to terminate Dr. Doyne as the court-appointed mediator, and to appoint minor's counsel for the boys. The court continued the hearing on father's request to terminate spousal support to mother.

In May 2011, the court denied father's request to terminate spousal support. The court also denied father's request to modify the then-existing custody orders; ruled the boys should remain enrolled at their then-current school; and ordered father to pay the amount he owed to Ryon's therapist so the parents each could take Ryon to therapy as deemed necessary by the therapist.

5

In late June 2012, mother moved for sole custody of both boys with father to have supervised visitation. In her 15-page declaration in support of her request, mother outlined in detail her view that Ryon was then refusing to spend time with her allegedly because of father's "influence, control and ability to manipulate Ryon," which she claimed was also beginning to occur with their younger son Craig.

Mother discussed in her declaration an issue that arose in early August 2011, that led to what she contended was her losing all contact with Ryon after she and father could not agree on the conditions that would allow Ryon to play tackle football:

"On the morning of Monday, August [1], 2011, I went to pick up the boys from Father after his weekend and Ryon came out with all of his new football gear expecting to go to his first practice the next day. Not wanting to involve Ryon in a decision that his father and I ultimately needed to make together, I told Ryon that his dad and I were still working out details and I would let him know if he would be going to the practice. I was shocked and upset that Father would sign him up and send him over with his gear without my consent, but I called Ryon's counselor to try and help mediate the terms we had previously discussed to see if there was still a chance we could reach an agreement that made me comfortable allowing Ryon to play in spite of the underhanded manner in which it was set up. However, even with the help of the counselor, we were unable to agree to the terms, and ultimately, I could not permit Ryon to play. Father is a high conflict person and I have learned over time that every capitulation was met with more demands

6

and more conflict.  In order to prevent complete annihilation of my parental authority, I had to take a reasonable stand.

"By the time I was able to speak to Ryon about it, Father and his wife had already called Ryon stating they were so sorry that mom would not let him play.  I pleaded with Ryon to try and understand what really happened, but he is too young to appreciate the complicated dynamics involved and should not have been put in the middle to begin with.  Ryon told me that he did not believe anything I said, he only believed his dad and stepmom.  In his mind, his dad and stepmom will allow him to do whatever he wants at their home, while mom does not care about anything he wants.

"Ryon went back to Father's house that Wednesday for Father's Wednesday and Thursday visitation then I was scheduled to pick the boys up for my weekend on Friday, August 5, 2011.  I arrived at Father's house early on Friday and our younger son Craig came out and told me Ryon was not going with us.  I also noted Father was home, which was very unusual as Father is almost never there when I pick up the boys so I knew something was up.  I was told that Ryon refused to go with me or see me and that was just too bad for me.  I would remind the Court again of that letter from Ryon that Father filed [five] months earlier which stated that even though he wanted to live with his dad, he loved me and had fun at our house so it was very perplexing that Ryon was stating he wanted nothing to do with me seemingly over a relatively minor argument over where to play football.

7

"I initially tried contacting the Sheriff to enforce the order but when they came out they spoke with Ryon who adamantly told them he would not come back to my house so the police threw up their hands and said they could not do anything and I left without him; Craig came with me without a problem and Craig and I have continued with our normal 50/50 schedule without a problem. My next approach was to just wait it out a little and hope that Ryon would come around; however, Father was clearly encouraging him to stay and I can only imagine what else Father may have been saying to him in private so waiting had little effect on the situation. After trying to wait it out for a couple months, it appeared that Ryon was not going to come around and Father was doing nothing to encourage him to see me. Father's approach, at least publically, was 'I support whatever Ryon wants, if he wants to see you, I'll encourage it, if he doesn't then I'll support that decision.' As such, I was left with this ridiculous situation of a 14-year-old deciding whether or not to follow a Court ordered visitation schedule with his mother."

Mother also noted Dr. Doyne "holds Father responsible for why the current order is not being followed." Specifically, mother cited to Dr. Doyne's February 8, 2012 correspondence in which Dr. Doyne stated his opinion that father should insist that Ryon spend time with mother:

"Based on my last interviews with Ryon, I believe he has the mistaken idea he gets to choose where he lives. In this regard, I have suggested to [father] that Ryon needs to be told he is going to be spending time with [mother] or else he will resist. In short, I believe Ryon has been empowered to think it is up to him where he spends his time. This

8

could lead him to be defiant of authority as recently [father] reported some disrespectful behavior on Ryon's part. Unless and until he is made to spend time with his mother by [father], I do not think Ryon will do so."

Mother stated she desperately was trying to repair her relationship with Ryon but father "has made that almost impossible by continuing to allow Ryon to 'escape' to his house if Ryon decides he does not like anything I do or say. This absurd dynamic of my 14-year-old son telling me how to act or he will not see me has been created by Father and should not be allowed to continue."

Father in response asked that the status quo be maintained, per Dr. Doyne's February 2012 recommendation; that Ryon be allowed to continue to reside with him and his family; that Ryon be allowed to continue at his current high school; that both parents be ordered to participate in "high conflict co-parenting classes"; and that if reunification therapy is necessary, mother pay for it and father pay $50 per month toward the outstanding balance owed Dr. Doyne.

Father in his declaration discussed the August 5, 2011 incident as well. Specifically, father noted that on or about that date, Ryon "started living with me on a permanent basis. At that time, he was uncomfortable visiting with [mother] due to the increasing conflicts between them. He has remained in my primary care since that time. He has established patterns and created emotional bonds over the last year that would be irreparably disrupted if he was removed from my home. Ryon feels safe in my home. We have established a relationship of openness, respect and trust.

9

"Immediately after Ryon expressed his desire to remain with me, [mother] began packing up his room to convert it into a 'play room.' [Citation.] She did not have any contact with Ryon for the next three months. He has spent very little time with [mother] since that time. He is comfortable in my home and sees his brother, Craig, frequently.

"On the morning of August 5, 2011, Ryon did not want to go with [mother] to the Colorado River. In response, [mother] called the . . . Sherriff's Department. [A deputy] was dispatched to my home. He spoke to [mother], Ryon, and me. He felt it [was] in Ryon's best interest to stay home. He then went and spoke [to mother] and she sped away. [The deputy] gave me an incident report . . . . I immediately called [the therapist] Sue Anne Edwards LFMT and I informed her."

Father denied that he was interfering in the relationship between Ryon and mother; that mother's request that father's time with his sons be limited to supervised visitation showed it was mother, and not father, that was attempting to alienate the children from one of their parents; that mother generally refuses to attend Ryon's activities and does so only if father agrees not to be present; that mother told Ryon "spending time at his sports games and practices was not how she wanted to spend her weekends"; and that mother allegedly has made myriad inappropriate comments to the boys including telling Ryon over the telephone she had breast cancer so she allegedly did not have to pick him up on time, that Ryon was a burden to her and wished he had never been born and that her boyfriend (a police officer) would pick up Ryon and take him to juvenile hall to show Ryon where he was going to end up, among others.

10

Father also stated mother constantly blamed him for the breakdown in her relationship with Ryon: "[Mother] says I empower and manipulate him. However, I have **always** been supportive of a relationship between Ryon and [mother]. I want to be very clear that I want Ryon to have visitation time with [mother]. I have even tried to help her repair the relationship by telling her when his important events are and encouraging her to attend. I have taken him to therapy and to Dr. Doyne's.

"I was advised that because of Ryon's age, I could not force him to visit [mother]. I am uncomfortable with the idea of *physically* forcing Ryon to visit [mother]. He has refused to get in the car for visits and he said [he would] run away if I dropped him off. He is fourteen and I cannot see physically forcing him into and out of my car. I don't believe that will facilitate a healthy relationship [and I] feel that forcing Ryon to visit [mother] would only build the resentment between them. After putting a lot of thought into the matter, I may be uncomfortable *forcing* Ryon to visit [mother] because I am over compensating for [mother's] lack of emotional support towards Ryon over the last year since he decided to live with me."

Father also stated that a "brief conversation" between the court and Ryon would confirm that father is not the cause of the strain between Ryon and mother and that Ryon wants to continue living with father but is open to rebuilding a relationship with mother.

In February 2013, father sought an order from the court to allow Ryon, who was then 15 years old, to testify at the upcoming evidentiary hearing on mother's request for sole custody of the boys. According to father, Ryon specifically requested he be allowed

11

to "address the court directly to provide input regarding his preferences on custody and visitation and other information that could assist the court in determining such issues, including material facts in controversy and the credibility of the parties regarding such matters . . . ."

In the declaration of father's attorney in support of that request, she noted that she had interviewed Ryon and he was "very forthcoming and articulate"; that she asked him myriad questions and, based on his thoughtful responses, concluded Ryon had not been coached; that he appeared to welcome the opportunity to speak with father's attorney; that he confirmed he wanted to testify at the hearing because "he wants to be heard and to have a voice in what happens to him to ensure his input and wishes are taken into consideration"; and that he understood he could be subject to cross-examination if he testifies.

Father's attorney further stated in her declaration that Ryon "informed me of his personal frustration in his dealings with both the reunification therapist . . . and the parties' private mediator, Dr. Stephen Doyne. His impressions, as expressed to me, were that both of these professionals have not truly listened to him, nor did his feelings seem to matter, much like his impressions in his dealings with his mother. He also expressed that neither counseling with his mother nor mediation changed or improved the difficulties he was experiencing with his mother."

Father's attorney also discussed the findings after Ryon and Craig were interviewed by family court services in August/September 2012. Ryon allegedly told the interviewer his reasons for the breakdown in the relationship with mother, including that they argue a lot; mother lies to him; mother makes him feel guilty "with things she says to him"; mother recanted on her promise for him to play football; and mother told him she wished Ryon had never been born and was a burden to her.

Father's attorney also touched on the issue of whether Ryon believed father was to blame for Ryon's issues with mother: "Ryon stated to me he believes his father encourages and supports him having a good relationship with his mother, that his father has told him of the importance of his relationship with his mother, and that his father has forced him to spend time with his mother against his wishes. Being forced to see her, however, makes him want to spend less time with her."

As discussed *post*, the court in March 2013 conditionally granted father's motion to allow Ryon to testify at the upcoming evidentiary hearing. However, the court in its order reserved the right to exclude any testimony from Ryon after it heard the testimony from "all other witnesses."

The record shows before the evidentiary hearing began, both mother and father submitted voluminous additional documents and/or information for the court to consider in ruling on mother's request for sole legal custody of the boys. Mother included an 11-page report of Dr. Doyne dated October 31, 2012 in which he continued to recommend the parents have joint legal custody of the boys, and mother would have visitation with

13

Ryon on alternate weekends from 11:00 a.m. to 7:00 p.m. when Craig was in her care. Dr. Doyne noted that the situation between Ryon and mother was "rather sad" and that Ryon mistakenly believes *he* can decide what type of visitation is appropriate with mother. Dr. Doyne also noted that father "will have to take a more supportive position" with respect to Ryon having a relationship with mother, "otherwise Ryon will remain estranged from [her]."

As noted by the court in its July 30, 2013 "order re: custody; visitation; fees/costs; reimbursement of Dr. Doyne's fees" (order), the matter came on for hearing on April 9, May 20 *and* June 4, 2013. At the conclusion of the testimony, the court issued its order, ruling in part as follows:

"The Court has considered the testimony of witnesses (including, but not limited to, the testimony of Stephen Doyne and his reports/letters/recommendations which were entered into evidence), exhibits introduced into evidence, the comments of counsel, including, but not limited to, the closing arguments which were submitted in writing.

"Cases involving children of this age are extremely difficult. The Court is aware that it is the best interests of the children, which control the decision in this case, and not the best interests of the parents.

"Ryon (age 15-16 in September) has been refusing all contact with the Respondent (his mother) for over a year. He has cut himself off from having any connection with his mother for over a year. It is obvious that the parents have refused to communicate effectively concerning their two children. This has played a major part in the breakdown

14

of the relationship that has occurred between the boys and their mother.  The Respondent has claimed that extreme alienation has been caused by the Petitioner relating to the relationship of Ryon and his mother.  The Court does not find that the evidence supports the position taken by the Respondent and the opinion of Dr. Doyne that the Petitioner has caused the alienation and the breakdown in the relationship between Ryon and his mother.  Therefore, the Court denies the request by the Respondent that she be granted sole legal and physical custody of both boys.  These two boys (especially Ryon) have been through enough stress caused by the inability of these two parents to come to any sort of an agreement regarding the two boys.  In fact, it appears that the Respondent has put herself in a position where she refuses to discuss even minor issues without involving a professional to resolve any differences the parties might have concerning the two boys.

"The Court finds that Ryon's alienation from his mother is not due to his father's influence.  The estrangement between Ryon and his mother has been caused, for the most part, by the mother's own actions.

"Therefore, as to Ryon, the Court orders that the father will have sole legal and physical custody of Ryon and that the Respondent/Mother be permitted to spend time with Ryon as mutually agreed upon between Ryon and his mother.  The father is to do everything possible to encourage the reunification of the relationship between Ryon and his mother.

"As to Craig, the Court orders that the parties are to have joint legal and physical custody of the minor child. If the parties are unable to make joint decisions concerning school selection and extra-curricular activities, the Father/Petitioner shall have the right to make the final decision. Further, the Court orders that the parties are to have a child-sharing plan with Craig on an alternating week schedule. The mother must realize that she is to make sure that Craig attends the extra-curricular activities that he wishes to participate in. This Court finds that it does not diminish a parent's role to request the assistance of the other parent in having a child attend extra-curricular activities.

"The Court finds it incredible that these parents are unable to attend an extra-curricular activity of the children at the same time. The Court understands the position of the Respondent that the Petitioner may be 'overly intimidating' but she needs to recognize her responsibility as a parent and to attend the activities whenever possible. The Petitioner is to understand the responsibility of a parent to attend the activities and to make it as pleasant as possible so as to minimize the stress upon the children in having both parents present at their extra-curricular activities.

"The Court orders that the parents bear their own attorneys' fees and costs and the costs incurred by Dr. Doyne be equally divided between the parties."

The record shows that both parties requested a statement of decision. The court in late August 2013 ordered father to submit a proposed statement of decision within 30 days, which the record shows father in fact did when he submitted in late September 2013

16

a 30-page proposed statement of decision.  However, the record[2] shows no statement of decision was ever entered.

## DISCUSSION

A.  *Statement of Decision*

Mother contends the order must be reversed because the statement of decision was never issued in this case.[3]  We disagree.

"The history, purpose and importance of a statement of decision are clear.  Section 632 [of the Code of Civil Procedure] originally required written findings of fact and conclusions of law.  [Citation.]  Findings were considered fundamental to the decisionmaking process.  [Citation.]  'The right to findings is a substantial right, as inviolate, under the statute, as that of trial by jury under the constitution.  [Citation.]  The

---

[2]     At mother's request, we take judicial notice of the fact the trial judge that heard and decided the matter and issued the order, the Honorable William J. McAdam, retired from the bench on September 30, 2013, just a few days after father submitted the proposed statement of decision.

[3]     We will assume, without deciding, that a statement of decision was required under Code of Civil Procedure section 632 after mother and father both asked for one.  (See, e.g., *In re Marriage of Askmo* (2000) 85 Cal.App.4th 1032, 1040 [concluding Code Civ. Proc., § 632 does not require a court to issue a statement of decision for an order on a motion, as contrasted to a trial followed by a judgment].)  This statute provides in part: "In superior courts, upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial. . . .  The request for a statement of decision shall specify those controverted issues as to which the party is requesting a statement of decision.  After a party has requested the statement, any party may make proposals as to the content of the statement of decision." (Code of Civ. Proc., § 632.)

17

code provision requiring written findings of fact is for the benefit of the court and the parties. To the court it gives an opportunity to place upon [the] record, in definite written form, its view of the facts and the law of the case, and *to make the case easily reviewable on appeal* by exhibiting the exact grounds upon which judgment rests. To the parties, *it furnishes the means, in many instances, of having their cause reviewed without great expense.* It also furnishes to the losing party a basis of his motion for a new trial; he is entitled to know the precise facts found by the court before proceeding with his motion for new trial, in order that he may be able to point out with precision the errors of the court in matters either of fact or law.' " (*Whittington v. McKinney* (1991) 234 Cal.App.3d 123, 126-127.)

"A statement of decision is as much, or more, for the benefit of the Court of Appeal as for the parties. It 'is our touchstone to determine whether or not the trial court's decision is supported by the facts and the law. [Citation.]' [Citation.] The importance of the statement of decision is underscored by the rule that a trial court's failure to render a statement of decision is reversible error." (*In re Marriage of Sellers* (2003) 110 Cal.App.4th 1007, 1010.) In family law cases, a statement of decision also serves as a useful guide to future decisions; it serves as an evidentiary benchmark for future modification orders. (*In re Marriage of Reilley* (1987) 196 Cal.App.3d 1119, 1126.)

It is axiomatic that when a party fails to request a statement of decision or fails to point out deficiencies in the statement of decision, we are to imply findings in support of the judgment. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-1134.)

However, we do not imply findings when, even in the absence of a statement of decision, the judgment or order sets forth the reasons for the court's decision. (See, e.g., *In re Marriage of Seaman & Menjou* (1991) 1 Cal.App.4th 1489, 1494, fn. 3 [comparing cases where the record contained no explanation of the basis of an award to the situation before it, where the judgment "sets forth the reasons" for the court order erroneously requiring one spouse to pay a portion of the other's fees incurred in defending a dependency proceeding]; *In re Marriage of Fingert* (1990) 221 Cal.App.3d 1575, 1580 [refusing to presume the trial court found all facts necessary to support the judgment because the record was sufficient to provide an explanation as to the reasoning of the court].)

Here, while the trial court did not issue a statement of decision, we conclude the order it did issue set forth at length and in detail the factual and legal basis of its decision to award father sole legal custody of Ryon and mother and father joint legal custody of Craig, with father having the right to make a final decision with respect to Craig's school selection and extracurricular activities if they cannot agree. We thus further conclude the order served the purpose of a statement of decision and deny mother's request to reverse the order because a statement of decision never issued.

B. *Adequacy of the Record*

Although the order provides sufficient detail for this court to conduct a meaningful review of the trial court's rulings, the same cannot be said about the record lodged by mother. As noted, the order states the evidentiary hearing on mother's request for sole legal custody of both boys took place over *three* days, namely on April 9, May 20 *and*

19

June 4, 2013.  The record shows that at the conclusion of the May 20 hearing, the court inquired how much longer father's counsel needed to complete the cross-examination of mother.  Father's counsel estimated she needed a few more hours.  Father's counsel also stated she planned on calling Ryon as a witness.  The court stated the evidentiary hearing would resume on June 4 at 9:00 a.m. and, once they finished with mother as a witness, it would take up the issue whether Ryon would testify.

Mother lodged the reporter's transcript from April 9 and May 20, 2013, but *not* the transcript from the June 4 hearing.  However, mother lodged the transcript from the August 9, 2013 ex parte hearing she set that involved a request for a statement of decision (discussed *ante*) and mother's request to stay the order, which the record shows was denied by the court.

" ' "A judgment or order of the lower court is *presumed correct.*  All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.  This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error." ' "  (*Gee v. American Realty & Construction, Inc.* (2002) 99 Cal.App.4th 1412, 1416.)  " 'A necessary corollary to this rule is that if the record is inadequate for meaningful review, the appellant defaults and the decision of the trial court should be affirmed.' "  (*Ibid.*)

An appellant bears the burden to provide a complete record to allow a reviewing court to access the purported error raised by appellant.  (See *Fundamental Investment etc. Realty Fund v. Gradow* (1994) 28 Cal.App.4th 966, 971.)  "[A] record is inadequate, and

20

appellant defaults, if the appellant predicates error only on the part of the record [appellant] provides . . . , but ignores or does not present to the appellate court portions of the proceedings below which may provide grounds upon which the decision of the trial court could be affirmed." (*Uniroyal Chemical Co. v. American Vanguard Corp.* (1988) 203 Cal.App.3d 285, 302.)

Therefore, if as in the instant case the record on appeal does not contain all of the documents or other evidence submitted to the trial court, a reviewing court will "decline to find error . . . and thus infer substantial evidence" supports the trial court's findings. (*Haywood v. Superior Court* (2000) 77 Cal.App.4th 949, 955.)

Here, mother provided an incomplete record. The court's order and the record itself show there were additional proceedings on June 4, 2013, when ostensibly mother's testimony was completed *and* when perhaps Ryon testified, as father's attorney discussed at the conclusion of the May 20 evidentiary hearing. Moreover, although the court reserved ruling on the issue of whether Ryon would in fact testify at the June 4 hearing, the record shows the court had preliminarily granted father's motion to allow that testimony to go forward. By failing to include in the record on appeal *all* the testimony and evidence given in connection with the court's order, we conclude mother has not rebutted the presumption that the trial court acted correctly when it issued its order in this case. (See *Osgood v. Landon* (2005) 127 Cal.App.4th 425, 435 [noting that if " 'appellant predicates error only on the part of the record [appellant] provides the trial court, but ignores or does not present to the appellate court portions of the proceedings below which

may provide grounds upon which the decision of the trial court could be affirmed,' " the record will be deemed inadequate and we presume there was no error].)

C. *The Merits of the Order*

Despite the inadequacy of the record and the presumption of correctness that applies to the order issued in this case, we nonetheless independently reviewed the testimony and evidence that mother included in the record and, based on that review, we have no difficulty concluding the trial court properly exercised its discretion when it made its findings and rulings in the order. (See *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255 [noting a court of review applies the " 'deferential abuse of discretion test' " when reviewing custody and visitation orders].)

Indeed, as noted in the summary *ante*, the record shows at the time of the hearing that Ryon was almost 16 years old and that Ryon was refusing all contact with mother. The record also shows that despite mother's contentions otherwise, substantial evidence in the record supports the court's finding in its order that father was *not* the cause of the breakdown in the relationship between Ryon and mother, and that in fact father *repeatedly* encouraged Ryon to have contact with mother; that at some point father's efforts paid off when Ryon had some limited contact with mother in the July/August 2012 timeframe, as noted by Dr. Doyne when he testified that Ryon did not want to have these visits with mother but did so only because his father made him; that when Ryon later refused to continue these Sunday visits, father reluctantly came to the conclusion that he could not physically force Ryon to see mother, as he believed, and the judge

22

tacitly found that doing so would only make things worse and not better between Ryon and mother; and that father was concerned that if he forced Ryon to visit with mother, Ryon might run away or engage in other destructive behaviors.

Father summarized his views on forcing Ryon to visit mother when he testified as follows: "I think trying to force a 15-year-old, especially Ryon, to do anything is going to do more harm than good at this point. It's been proven. I've tried to force him; experts have tried to force him. I have physically, you know, to the point of forcing him, you know, with having arguments with his mom in front of him . . . . Forcing him is not working. There's—he's pulling back harder by forcing him. It's in my opinion, it's just not working."

The record also supports the finding of the trial court in its order that the breakdown in the relationship between mother and Ryon was "caused, for the most part, by the mother's own actions." Indeed, the record shows that because of a single "confrontation" in early July 2010—as told differently by mother and father—that occurred between them at one of Ryon's sports activities, mother from that point forward for the most part refused to attend Ryon's athletic activities, extracurricular activities, school meetings (i.e., when Ryon was experiencing some bullying issues at school) and medical appointments if father was also expected to be present. Mother explained she refused to attend these events because of the "conflict that will arise from being near [father]." Mother also refused to speak with father after this confrontation because she was not "comfortable" doing so and insisted that *all* communications be made via email,

23

which clearly made it difficult if not impossible for mother and father to make a good faith effort to resolve any issues between them and/or the boys—as they had agreed to do—before seeking help from the professional mediator.

The record also shows that mother took no responsibility for any of the problems she and Ryon were having, despite the fact that even Dr. Doyne recognized there were some "missteps" by mother.  Specifically, during her examination, mother confirmed her belief that it was father and his "influence, control, and manipulation" that was the *sole* cause of the alienation between her and Ryon:

Question to mother:  "So you don't believe you've done anything whatsoever to contribute to that [i.e., the alienation]?"

Mother:  "No."

Question to mother:  "And you think that, but for [father] and his relationship with the kids, you would continue to enjoy a strong, loving relationship without any conflict with Ryon?"

Mother:  "Going forward, yes."

The record also shows that mother refused to recognize that Ryon had a close relationship with father, with whom Ryon had been living with for more than a year at the time of the evidentiary hearing:

Question to mother:  "So do you know . . . whether he [i.e., Ryon] has a close relationship with his dad?"

Mother:  "I—I don't know."

Mother also refused to acknowledge at least the *possibility* that, if she was awarded sole legal and physical custody of Ryon, it could be detrimental for Ryon not to see father:

Question to mother:  "How do you think he [i.e., Ryon] would feel if he was close with his father to be cut off from him, as you propose?"

Mother:  "I don't know how he would feel, if that's—I don't know.  That's a circumstance we haven't come across yet."

Question to mother:  "You'll put your son at risk—"

Mother:  "I'd never put Ryon a[t] risk."

Question to mother:  "Pardon?"

Mother:  "I wouldn't ever put Ryon at risk."

Question to mother:  "You don't see any potential harm that could come of that?"

Mother:  "Any potential?  I think if [father] gets help, I think they could have a healthy relationship at some point.  I would absolutely want that."

Question to mother: "But you don't think there could be any potential harm from cutting him off from . . . another person he feels close with?"

Mother:  "I don't think there would be harm, or any harm to Ryon."

The record also shows that when father early on requested additional time with the boys, including a 50-50 split of time with mother that was ultimately recommended by two private mediators, mother initially rejected it without asking either Ryon or Craig if they wanted to spend more time with father:

25

Question to mother: "And isn't it true that you informed [the private mediator] that you were happy with the existing schedule [that gave mother more time with the boys than father] and thought [father] was seeking to take time away from you that the boys were enjoying? Isn't that what you told her?"

Mother: "I believe so."

Question to mother: "And that was your sentiment at the time?"

Mother: "I believe that it was, yes."

Question to mother: "Did you ever talk to the kids to find out if they wanted to have some more time with their dad?"

Mother: "I did not. I don't discuss court orders, court issues with the boys at all."

Question to mother: "You didn't have to discuss the court issue. You could just ask, 'How would you like to spend more time with your dad?' Why does that involve a court issue?"

Mother: "I think that's between his dad and I to discuss. The boys, if they were in mediation talking about this with someone, they would have an opportunity to voice their opinions there. I don't believe that's a mom or dad issue to find out about, unless they brought it up themselves."

The record shows mother eventually agreed to the 50-50 split proposed by father after a private mediator interviewed both boys and reported the boys in fact wanted to spend more time with father as he proposed.

The record also supports the court's finding that it was in Ryon's best interest for father to have sole legal and physical custody of him and for father to act as the "tie-breaker" with respect to Craig and his "school selection and extra-curricular activities," as both parents and Dr. Doyne testified that judicial intervention was required in this case because the relationship between the parents had deteriorated to the point it was no longer possible for them to share custody of Ryon and to make decisions together on relatively minor issues involving the boys without involving a professional mediator; that mother admitted she refused to confer with father about enrolling the boys in sports and extracurricular activities and "always" sought professional assistance to work out the details; that Ryon was then living with father and his family, was thriving and was clear that he wanted to continue in that arrangement; that Ryon was having medical issues that father primarily was handling; that Ryon not only did not want to live with mother, but he also did not want to have visits with her; that Ryon at the time of the hearing was almost 16 years old, felt mother did not respect and listen to him and believed mother lied to him (i.e., about having breast cancer); and that father was a responsible and loving parent and would continue to encourage Ryon to have a relationship with mother.

That there is evidence in the record that would support findings that were different than those made by the court, including a finding awarding mother sole legal and physical custody of Ryon, for example, or a finding making her the "tie-breaker" regarding Craig's school choice and extracurricular actives, does not change our decision in this case. "In reviewing the sufficiency of the evidence on appeal, we look to the

27

entire record to determine whether there is substantial evidence to support the findings of the . . . court. We do not pass judgment on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Rather, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the . . . court's order, and affirm the order even if there is other evidence that would support a contrary finding." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 915-916.)

Like the trial court, we too recognize that cases such as the instant one can be "extremely difficult." In our role as a court of review and in our discussion we mean no disrespect, as it is clear from the record mother loves the boys and is doing what she believes is right to regain a meaningful and loving relationship with Ryon. That said, we are constrained to conclude that the trial court properly exercised its discretion in its rulings in connection with the order and that the findings made by the court therein are supported by substantial evidence in the record.

## DISPOSITION

The order of the court is affirmed.

BENKE, Acting P. J.

WE CONCUR:

HUFFMAN, J.

McINTYRE, J.

28