Filed 10/30/14; part. pub. & mod. order 11/26/14 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of CHARLES D. and CONNIE A. McHUGH. | |
| CHARLES D. McHUGH, Appellant, v. CONNIE A. McHUGH, Respondent; ORANGE COUNTY DEPARTMENT OF CHILD SUPPORT SERVICES, Respondent. | G048551 (Super. Ct. No. 09D008768) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Duane T. Neary, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Affirmed.

Steven A. Madoni; John L. Dodd & Associates, John L. Dodd and Benjamin Ekenes for Appellant.

Keith E. Dolnick for Respondent Connie A. McHugh.

Kamala D. Harris, Attorney General, Julie Weng-Gutierrez, Assistant Attorney General, Linda M. Gonzalez and Ricardo Enriquez, Deputy Attorneys General, for Respondent Orange County Department of Child Support Services.

\*     \*     \*

Appellant Charles D. McHugh filed an order to show cause asking the trial court to reduce his child support obligations because he lost his job as a commissioned salesman and his new job paid considerably less.[1]  In opposing Charles's request, respondent Connie A. McHugh countered by asking the trial court to increase support because Charles lost his job for diverting business from his employer to his father's competing company for the admitted purpose of minimizing his reported income and reducing his support obligations.  Connie argued the court should increase support based on Charles's income at his original job because Charles refused his employer's offer to retain him if he fully disclosed his misconduct and paid his employer restitution.  The trial court denied Charles's request to reduce support and granted Connie's request to increase support by imputing income to Charles at the level he earned before engaging in his misconduct.

Family Code section 4058, subdivision (b), grants trial courts discretion to set child support based on a parent's earning capacity rather than actual income if the court finds the parent has the ability and opportunity to earn income at the level to be imputed.[2]  As explained below, this discretion includes imputing income to the parent

---

[1]     For clarity, "we refer to the parties by their first names, as a convenience to the reader.  We do not intend this informality to reflect a lack of respect.  [Citation.]" (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1513, fn. 2.)

[2]     All statutory references are to the Family Code unless otherwise stated.

based on earnings at a prior job, without evidence the parent has the current opportunity to earn at that same level, if the parent left or otherwise lost the job in a manner reflecting a voluntary and deliberate divestiture of financial resources required to pay child support obligations, and imputing income at that level is in the child's best interests.

We affirm the trial court's order exercising its discretion to impute income under section 4058, subdivision (b), because substantial evidence supports the findings that (1) Charles had the ability and opportunity to keep his job; (2) his termination was a voluntary divestiture of resources required for child support obligations because of his misconduct in diverting business to his father's company to avoid his support obligations and deliberately failing to satisfy his employer's conditions for keeping his higher paying job; and (3) imputing income to Charles was in the child's best interests.

I

FACTS AND PROCEDURAL HISTORY

Charles and Connie wed in 1992, and have one child who was born in 1996. The couple separated in September 2009, and Charles filed a petition to dissolve the marriage that same month. Almost immediately, Connie filed an order to show cause seeking temporary child and spousal support. In November 2009, the trial court granted Connie's request, ordering Charles to pay $2,227 in child support and $4,773 in spousal support each month. The court based its award on Charles's monthly income of $24,159 as a successful salesman for Amcor Packaging Distribution (Amcor), and Connie's lack of income as a stay-at-home mom.

In early 2010, Charles filed an order to show cause seeking to reduce the amount of temporary child and spousal support based on his reduced income. In his supporting declaration, Charles explained he suffered a drastic income reduction in December 2009 when his largest client decided not to renew its contract with Amcor. According to Charles, he was paid on a commission, and the loss of that client cut his

3

income nearly in half. Charles also argued Connie was a licensed attorney and the court should require her to find employment. In March 2011, the trial court granted Charles's request and reduced his monthly child support to $1,275 and his monthly spousal support to $2,840.

In August 2011, Connie and Charles each filed applications seeking to change the court's March 2011 ruling. Connie filed a motion to set aside the March 2011 order, while Charles filed another order to show cause seeking to further reduce his support obligations. In her motion, Connie argued the March 2011 order should be set aside because Charles misrepresented his income to the court. In his order to show cause, Charles argued he suffered another drastic reduction of income because Amcor fired him in April 2011, and his new job paid considerably less. In response, Connie asked the court to increase the temporary support by reinstating the original support order.

In November 2011, the trial court conducted an evidentiary hearing on Connie's motion to set aside, but it continued the hearing on the other requests. At the hearing, the court received testimony from Thomas Sarnecki, Amcor's Vice President of Workplace Relations and Employment Counsel. Sarnecki explained Charles was one of Amcor's top salesmen earning between $137,000 and $597,000 per year during the period 2003 to 2009. In 2009, Charles asked Amcor to help him reduce his income because he was about to become embroiled in a bitter divorce and wanted to minimize his earnings. According to Sarnecki, Amcor told Charles it could reassign him to a lower paying position, but it would not cooperate with any of his other "more aggressive approach[es]," such as diverting some of his compensation. Charles therefore remained in the same position and his compensation arrangements did not change.

In the months following these discussions, Sarnecki testified Amcor noticed a significant drop in the amount of sales Charles generated. Charles explained the decrease was due to the downturn in the economy and the lack of competitiveness in some of Amcor's bids. Sarnecki explained Amcor initially believed Charles's

4

explanation because of his past faithful service, but it began investigating him and his accounts after one of Charles's customers asked Amcor about the products it had purchased and Amcor's records showed the customer had not purchased anything in a couple of years.

Sarnecki further testified Amcor's investigators discovered Charles's father operated a competing business, Value Added Packaging & Printing, Inc. (Value Added), and the investigators believed Charles had diverted some of Amcor's business to his father's business. The investigators also believed Charles used one of Amcor's other salesmen to close sales with some of Charles's customers, and then Charles and the other salesman would share the commission.

In March 2011, Sarnecki and other Amcor executives met with Charles to discuss the investigators' findings. During this meeting, Charles admitted he had done a lot of "'stupid stuff'" in trying to reduce his income and settle his divorce, including diverting business to Value Added and entering into improper commission sharing agreements with another salesman on at least three accounts. Sarnecki further testified that Charles admitted what he did "'wasn't right,'" showed remorse for his actions, and wanted to "come clean" so he could keep his job.

Based on Charles's admissions and his many years of successful service, Amcor offered to retain Charles if he satisfied three conditions: (1) he fully disclosed all of his misconduct; (2) he paid Amcor restitution for the business he diverted; and (3) he agreed to a "last chance" employment agreement. Sarnecki thought Charles would accept these conditions because he appeared remorseful, but Charles refused to pay restitution or disclose the business he diverted. Instead, he told Sarnecki and the other executives, "' . . . I can't tell you . . . I know it was wrong . . . You're going to get mad at me. . . .'" When Charles refused to cooperate and agree to these conditions, Amcor terminated Charles's employment and filed a lawsuit against him, his father, and Value Added to recover the diverted income.

5

Charles testified to his version of the meetings with Sarnecki and Amcor's investigators. Charles admitted he made many of the statements Sarnecki attributed to him, but he testified those statements were not true. According to Charles, he made those statements because Amcor's investigators told him he would have to make those admissions to keep his job.

In December 2011, the trial court denied Connie's set aside motion. The court explained the only permissible ground for granting the motion would be if Charles defrauded the court by misrepresenting his income. The court found Charles attempted to divert business from Amcor, but Connie failed to show he diverted any particular business or the amount of Charles's actual income when the court made its March 2011 support order. Without evidence showing a specific income that differed from the court's earlier findings, the court concluded it could not grant Connie's motion.

In late 2012, the court conducted hearings on Charles's request to further reduce his support obligations and Connie's counter request to increase his support obligations. Charles and Connie stipulated the court would decide these requests based on the testimony it received during the earlier hearings on Connie's set aside motion. In February 2013, the court denied Charles request and granted Connie's: "The Court finds that [Charles] had the opportunity to continue his employment at AMCOR and that [Charles] was terminated as a result of his non-cooperation in the investigation into his own misconduct. The Court finds that his misconduct was part and parcel of his attempt to lower Child and Spousal Support. Therefore, the Court finds, termination from AMCOR is deemed an unwillingness to work. (*In re Marriage of Regenery* (1989) 214 Cal. App. 3d 1367) The Court finds that this order is in the best interest of the child. [¶] The Court's other findings are as indicated in the Dissomaster computer printout . . . attached to this order. This Child Support order commences August 1, 2012."

The computer printout attached to the court's order reveals the court did not use the amount of Charles's current income at his new job, but imputed monthly income

6

to Charles at the same level he earned at Amcor when the court made its original support order in November 2009, i.e., $24,159.  The court also imputed monthly income to Connie in the amount of $8,333.  Based on these findings, the court ordered Charles to pay monthly child support of $2,047, nearly an $800 per month increase from the March 2011 support order and just $180 less per month than the original November 2009 support order.  The court's order did not specify an amount of spousal support.  Charles timely appealed the court's February 2013 order.

## II

### DISCUSSION

A.    *Governing Legal Principles on Child Support and Imputing Income*

California has adopted a "statewide uniform guideline" for determining child support according to a complex formula based on each parent's income and custodial time with the child.  (§§ 4050, 4055; *In re Marriage of Smith* (2001) 90 Cal.App.4th 74, 80-81 (*Smith*).)  The child support amount the formula establishes is rebuttably presumed to be the correct amount, and the court may order a different amount only in limited circumstances and only after making certain findings.  (§ 4057; *Smith*, at p. 81.)  Determining the amount of child support therefore is a highly regulated area of the law, and the only discretion the trial court has is the discretion conferred by statute or rule.[3]  (*Smith*, at p. 81.)

---

[3]    Although Charles's order to show cause sought to reduce both his child and spousal support obligations and Connie's counter request sought to increase both Charles's child and spousal support, the parties' briefs only address the child support order.  Accordingly, "[a]lthough the rules pertaining to the imputation of income for purposes of spousal and child support may differ, . . . we consider any issue that may pertain to this distinction waived for purposes of this appeal."  (*In re Marriage of Eggers* (2005) 131 Cal.App.4th 695, 699 (*Eggers*).)

7

The Family Code has granted the trial court discretion when imputing income to a parent based on his or her "earning capacity." (§ 4058, subd. (b).) Specifically, section 4058, subdivision (b) states, "The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children." (*Ibid*.)

Originally, "the exercise of this discretion was limited to situations where the parent was found to be deliberately shirking family responsibilities by refusing to seek or accept gainful employment. [Citations.] No such limitation exists under the present scheme, however. [Citations.] 'While deliberate avoidance of family responsibilities is a significant factor in the decision to consider earning capacity [citation], the statute explicitly authorizes consideration of earning capacity in all cases,' consistent with the child's best interests. [Citations.]" (*Smith*, *supra*, 90 Cal.App.4th at p. 81.)

The Family Code does not define earning capacity, but its meaning has been established through case law. (*Eggers*, *supra*, 131 Cal.App.4th at p. 699.) "'Earning capacity is composed of . . . *the ability to work*, including such factors as age, occupation, skills, education, health, background, work experience and qualifications; . . . and *an opportunity to work* . . . .' [Citation.]"[4] (*Mendoza v. Ramos* (2010) 182 Cal.App.4th 680, 685 (*Mendoza*).) "The 'opportunity to work' exists when there is substantial evidence of a reasonable 'likelihood that a party could, with reasonable effort,

---

[4] As originally established in *In re Marriage of Regnery* (1989) 214 Cal.App.3d 1367 (*Regnery*), this earning capacity standard included a third prong, "the willingness to work exemplified through good faith efforts, due diligence and meaningful attempts to secure employment." (*Id*. at pp. 1372-1373.) "Later courts, recognizing . . . the . . . willingness to work [element] should be taken for granted, recast *Regnery*'s three-prong test as a simple two-prong test: ability and opportunity." (*In re Marriage of Bardzik* (2008) 165 Cal.App.4th 1291, 1302 (*Bardzik*); *State of Oregon v. Vargas* (1999) 70 Cal.App.4th 1123, 1126 (*Vargas*).)

apply his or her education, skills and training to produce income.' [Citation.]" (*Smith*, *supra*, 90 Cal.App.4th at p. 82.)

"'When the ability to work or the opportunity to work is lacking, earning capacity is absent and application of the standard is inappropriate. When the payor is *unwilling* to pay and the other two factors are present, the court may apply the earnings capacity standard to deter the shirking of one's family responsibilities.' [Citation.]" (*Mendoza*, *supra*, 182 Cal.App.4th at p. 685, original italics.) Accordingly, "'"[t]he only limitations against imputing income to an unemployed or underemployed parent is where the parent in fact has *no* 'earning capacity' . . . or relying on earning capacity would not be consistent with the children's best interest. . . ."'" [Citation.] In other words, '[a]*s long as ability and opportunity to earn exist*, . . . the court has the discretion to consider earning capacity when consistent with the child or children's best interests. . . .' [Citation.]" (*Vargas*, *supra*, 70 Cal.App.4th at p. 1126, original italics.)

On an application to modify support by imputing income to a parent based on earning capacity, the burden of proof as to ability and opportunity to earn imputed income changes depending on which parent—the payor or the payee—is seeking to change the status quo. For example, "where the payor parent loses his or her job and seeks a reduction in court-ordered support based on the changed circumstances of lack of income, it will be the payor parent, as moving party, who bears the burden of showing a *lack* of ability and opportunity to earn income." (*Bardzik*, *supra*, 165 Cal.App.4th at p. 1304, original italics; see also *id*. at pp. 1308-1309; *Eggers*, *supra*, 131 Cal.App.4th at p. 701.) In contrast, when the payee parent seeks to increase the amount of court-ordered support by imputing to the payor parent a greater income than the court previously had ordered, the payee parent, as the moving party, bears the burden of proof to show the payor parent *has* the ability and opportunity to earn that imputed income. (*Bardzik*, at p. 1294.)

9

The parent seeking to impute income must show that the other parent has the ability or qualifications to perform a job paying the income to be imputed and the opportunity to obtain that job, i.e., an available position. The parent seeking to impute income, however, does not bear the burden to show the other parent would have obtained the job if he or she applied. (*In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331, 1339 (*LaBass & Munsee*); see *Bardzik*, *supra*, 165 Cal.App.4th at pp. 1305-1306.)

For example, in *LaBass & Munsee*, the father sought to modify the existing support order by imputing a full-time teacher's salary to the mother even though the mother was only working as a part-time teacher. The father met his burden to show the mother's ability and opportunity to earn a full-time teaching salary by presenting evidence showing the mother had a teaching credential, the local school district had multiple openings for full-time teachers with the mother's background and experience, and the pay scale for a full-time teacher with the mother's level of education and experience. (*LaBass & Munsee*, *supra*, 56 Cal.App.4th at pp. 1335-1336.) Based on this showing, the trial court imputed the full-time teaching salary to the mother. The appellate court rejected the mother's argument the award was based on nothing but "guesswork," explaining, "[The father] bore no burden to convince the court that [the mother] *would have* secured a full-time job had she applied. Rather, it was incumbent upon [the mother] to show that, despite reasonable efforts, she could not secure employment despite her qualifications." (*Id.* at p. 1339, original italics.)

We review an order establishing or modifying child support based upon earning capacity for an abuse of discretion. (*In re Marriage of Berger* (2009) 170 Cal.App.4th 1070, 1079 (*Berger*); *Vargas*, *supra*, 70 Cal.App.4th at p. 1126.) "[W]e consider only 'whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion.' [Citation.] . . . '[W]e do not substitute our own judgment for that of the trial court, but determine only if any judge reasonably could have made such an order.'" (*Berger*, at p. 1079.)

10

B.      *We Infer All Necessary Findings Supported by the Record Because Charles Failed to Request a Statement of Decision*

When modifying a support order, the trial court must provide a statement of decision explaining its ruling *if requested* by either parent. (§ 3654; *In re Marriage of Sellers* (2003) 110 Cal.App.4th 1007, 1010.) A statement of decision generally must provide the factual and legal basis for the trial court's decision as to each of the principal controverted issues. (Code Civ. Proc., § 632; see *Sellers*, at p. 1010.)

"Under the doctrine of 'implied findings,' when parties waive a statement of decision expressly or by not requesting one in a timely manner, appellate courts reviewing the appealed judgment must presume the trial court made all factual findings necessary to support the judgment for which there is substantial evidence." (*In re Marriage of Condon* (1998) 62 Cal.App.4th 533, 549-550, fn. 11 (*Condon*); see *In re Marriage of Starr* (2010) 189 Cal.App.4th 277, 287; *In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 928 (*Cohn*).) A party who does not request a statement of decision may not argue the trial court failed to make any finding required to support its decision. (*Ibid*.)

Here, Charles waived any objection the trial court did not make necessary findings because he failed to ask the trial court for a statement of decision. We therefore imply all findings necessary to support the trial court's order denying Charles's request to reduce his support obligations and granting Connie's request to increase his support obligations. (*Cohn*, *supra*, 65 Cal.App.4th at p. 928; see *Fair v. Bakhtiari* (2011) 195 Cal.App.4th 1135, 1148.)

Citing *In re Marriage of Askmo* (2000) 85 Cal.App.4th 1032, 1040, Charles contends "a statement of decision [was not] required here" because an order on a motion does not require a statement of decision. He is mistaken. The trial court's order was not merely an order on a motion, but rather an order modifying a support order. Section 3654

therefore required a statement of decision and Charles's failure to request a statement requires us to invoke the implied findings doctrine.

Charles also contends the implied findings doctrine does not apply because the trial court's order adequately identified the legal basis for its ruling and the evidence it considered. To support this contention, Charles cites *In re Marriage of Fingert* (1990) 221 Cal.App.3d 1575, 1580, and *In re Marriage of Seaman & Menjou* (1991) 1 Cal.App.4th 1489, 1494, fn. 3. In *Fingert*, the Court of Appeal declined to apply the implied findings doctrine because the appeal was based on a settled statement of facts, the trial court's decision, and the reasons for the trial court's decision. The *Fingert* court concluded the settled statement provided it with the necessary information to decide the appeal, but the court cited no authority establishing an exception to the implied findings doctrine for an appeal based on a settled statement.[5] (*Fingert*, at p. 1580.) *Seaman & Menjou* followed *Fingert* without analysis. (*Seaman & Menjou*, at p. 1494, fn. 3; see also *Condon*, *supra*, 62 Cal.App.4th at p. 549, fn. 11 [following *Fingert* without analysis].)

None of these cases apply here because Charles does not base his appeal on a settled statement, but rather on the clerk's and reporter's transcripts he designated. Moreover, although the foregoing cases seek to create an exception to the implied findings doctrine, several respected treatises explain, "The apparent consensus is that appellant's express or implied waiver of a statement of decision on the appealed issues *unequivocally* invokes the doctrine of 'implied findings.'" (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2014) ¶ 15:103, pp. 15-23 to 15-24, original italics; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2014) ¶ 8:24, pp. 8-13 to 8-14; Friedman et al., Cal. Practice Guide:

---

[5] California Rules of Court, rule 8.137 allows an appellant to appeal based on a settled statement of the trial court proceedings in lieu of a reporter's and clerk's transcript.

12

Landlord-Tenant (The Rutter Group 2014) ¶ 9:267, pp. 9-69 to 9-70.) We therefore follow the general rule and apply the implied findings doctrine.

C.      *Charles Failed to Show He Was Entitled to a Reduction in His Support Obligations*

Charles contends the trial court erred in denying his request to reduce his support obligations because there is no substantial evidence to support a finding he had the opportunity to keep his job at Amcor instead of taking his new, lower paying job. Without evidence showing he could keep his Amcor job and continue earning at the same income level the court used to calculate his support under the March 2011 order, Charles contends the court erred in refusing to reduce his support obligations to an amount commensurate with his lower income. We disagree because Charles misconstrues the burden of proof on his request, and substantial evidence supports the trial court's ruling.

As the moving party seeking to modify the existing support order, Charles bore the burden to show not only that he lost his Amcor job, but also that he lacked the ability and opportunity to keep that job and continue earning at the same level. (*Bardzik*, *supra*, 165 Cal.App.4th at p. 1304; *Eggers*, *supra*, 131 Cal.App.4th at p. 701.) Here, it is undisputed Amcor fired Charles, but it also is undisputed Amcor gave Charles the opportunity to keep his job if he satisfied three conditions: (1) fully disclosing all information about his improper conduct; (2) paying Amcor restitution for the business he diverted; and (3) entering into a last chance employment agreement with Amcor. Accordingly, to obtain an order reducing his support obligations it was Charles's burden to present evidence showing he could not satisfy these conditions, and therefore did not have the opportunity to keep his job.

On the disclosure condition, Charles contends the "only testimony on this point" was his testimony stating he was "unable to give [Amcor] what [it] wanted" and he "didn't have the information that they were looking for." Charles acknowledges Sarnecki testified Charles "avoided directly answering the question[s Amcor asked,] and

13

said things such as, ' . . . I can't tell you . . . I know it was wrong . . . You're going to get mad at me . . . .'" According to Charles, this is not substantial evidence he "*had* the needed information." (Original italics.)

Charles, however, ignores Sarnecki's other testimony that Charles admitted he (1) diverted business to Value Added; (2) entered into improper commission sharing agreements with another salesman on at least three accounts; (3) broke the trust Amcor placed in him; and (4) "what he did 'wasn't right.'" Charles also ignores Sarnecki's testimony that Amcor learned a customer recently had purchased Amcor products through Charles, but Amcor's records showed the customer had not purchased any products for at least two years. This testimony constitutes substantial evidence supporting the reasonable inference Charles had the information Amcor sought and Charles's testimony to the contrary does not undermine the evidence's substantiality. (*Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 308 (*Leung*) ["in evaluating a claim of insufficiency of evidence, a reviewing court must resolve all conflicts in the evidence in favor of the prevailing party and must draw all reasonable inferences in support of the trial court's judgment"].) Moreover, Charles bore the burden to show he could not provide the information to Amcor, which required him to show he did not have the information *and* he could not obtain it. The evidence Charles cites does not satisfy this burden.

On the restitution condition, Charles faults Connie for failing to present evidence showing how much restitution Amcor demanded and evidence Charles had the financial ability to pay the amount demanded. In Charles's view, the absence of evidence on these points prevented the trial court from finding Charles could satisfy the restitution condition, and therefore the court erred in finding Charles had the opportunity to keep his job. But Charles bore the burden to show he could not satisfy this condition, not Connie. (*Bardzik*, *supra*, 165 Cal.App.4th at p. 1304; *Eggers*, *supra*, 131 Cal.App.4th at p. 701.)

14

The lack of evidence on this point is therefore fatal to Charles's challenge, not the trial court's ruling.[6]

D.      *Substantial Evidence Supports the Trial Court's Ruling Imputing Income to Charles*

Charles contends the trial court erred in granting Connie's request to increase his support obligations for three reasons. We separately address each of them.

1.      Connie Established Charles Had the Ability and Opportunity to Keep His Job at Amcor

Charles first contends the trial court erred in imputing income to him based on his Amcor earnings because Connie failed to satisfy her burden that Charles had the ability and opportunity to keep his job. According to Charles, Connie had to show not only that Amcor offered to allow Charles to keep his job, but also that he had the means to satisfy Amcor's conditions. Charles again misconstrues the applicable burden of proof, and substantial evidence supports the trial court's implied finding Connie met her burden.

As the parent seeking to change the existing support order by imputing income to Charles at the level he would have earned if he kept his job at Amcor, Connie bore the burden to show Charles had the ability and opportunity to remain at Amcor. (*LaBass & Munsee*, *supra*, 56 Cal.App.4th at p. 1339; see *Bardzik*, *supra*, 165 Cal.App.4th at pp. 1305-1306.) Connie satisfied that burden by submitting substantial, undisputed evidence showing Charles excelled at that job for most of their 17-year marriage and Amcor offered to allow Charles to keep his job if he fully disclosed his wrongdoings, paid Amcor restitution for the business he diverted, and entered into a last chance employment agreement.

---

[6]      We do not address the third condition Amcor imposed on Charles keeping his job—entering into a last chance employment agreement—because Charles's failure to show he could not satisfy the first two conditions renders this moot.

As explained above, the parent seeking to impute income to the other parent need only show the other parent had the ability to perform the job earning the income to be imputed and the job was available. The parent to whom the income would be imputed bears the burden to show he or she could not secure the job despite reasonable efforts. (*LaBass & Munsee*, *supra*, 56 Cal.App.4th at p. 1339; see *Bardzik*, *supra*, 165 Cal.App.4th at pp. 1305-1306.) We explained the rationale for putting this burden on the parent to whom the income would be imputed in *Bardzik*: "This rule is grounded in the commonsense proposition that you can lead someone to a want ad but you can't make them apply for the job. . . . Readers need only use a little imagination to think of all the ways that a parent with both ability to do a job and the opportunity to get it could subtly sabotage a job application or interview." (*Bardzik*, at p. 1305.)

Here, it takes little imagination to think of the many ways Charles could sabotage Amcor's offer to allow him to keep his job if he satisfied Amcor's conditions. For example, as the trial court impliedly found, he could simply refuse to provide the information Amcor sought and refuse to pay restitution. Whether Charles could satisfy Amcor's conditions lay uniquely within his knowledge and control. It therefore is reasonable that Charles should bear the burden to show he could not satisfy the conditions despite reasonable efforts. (See *Bardzik*, *supra*, 165 Cal.App.4th at pp. 1305-1306; *LaBass & Munsee*, *supra*, 56 Cal.App.4th at p. 1339.)

As explained above, substantial evidence supports the trial court's implied finding Charles could have provided the information Amcor requested, but refused to provide it. As for the restitution condition, Charles failed to provide any evidence showing he lacked the financial resources to pay Amcor restitution. Accordingly, Charles failed to show he could not satisfy Amcor's conditions and substantial evidence supports the trial court's implied finding Charles had the ability and opportunity to keep his job.

16

2. The Trial Court Had Discretion to Impute Income to Charles Based on His Previous Earnings

Assuming he had the opportunity to remain with Amcor, Charles contends the trial court nonetheless erred in imputing income to him at the level he earned in November 2009 because Connie failed to show he had the *current* opportunity to earn the same income. According to Charles, the trial court could not impute income to him based on his November 2009 earnings without substantial evidence showing not only that he had the opportunity to keep his job at Amcor, but also the present opportunity to earn the same income. Neither the law nor the facts support Charles's contentions.

Under section 4058, subdivision (b), a trial court has discretion to impute income based on a job the parent previously held depending on the circumstances under which the parent quit or otherwise left that job. (*Eggers*, *supra*, 131 Cal.App.4th at p. 700; *In re Marriage of Padilla* (1995) 38 Cal.App.4th 1212, 1219-1220 (*Padilla*); *In re Marriage of Ilas* (1993) 12 Cal.App.4th 1630, 1638-1639 (*Ilas*); *Regnery*, *supra*, 214 Cal.App.3d at pp. 1373-1376.)

In *Padilla*, the father quit a well-paying job to start his own business shortly before a hearing to determine whether his support obligations should be increased based on the newly-enacted statutory formula for determining child support. The court ordered the support to remain the same for six months to allow the father time to start his new business. At the end of that six-month period, the father had not paid any support, had not earned any income from the business, and produced no evidence to show the situation would improve. The trial court therefore increased the father's support obligations by imputing income to him based on his earnings at the job he left several months earlier. (*Padilla*, *supra*, 38 Cal.App.4th at pp. 1214-1215.) We affirmed the trial court's exercise of its discretion because "'"[a parent does] not have the right to divest himself [or herself] of his [or her] earning ability at the expense of . . . minor children."'" [Citations.]" (*Id.* at p. 1218.) Instead, "a child support obligation '"must be taken into account whenever an

17

obligor wishes to pursue a different lifestyle or endeavor. . . .  [It is] an overhead which must be paid first before any other expenses. . . .'"  [Citations.]"  (*Ibid.*)

Similarly, in *Ilas*, the trial court imputed income to a father based on his earnings from the job he left a year earlier to start medical school.  (*Ilas*, *supra*, 12 Cal.App.4th at pp. 1633-1634.)  The Court of Appeal affirmed, explaining "'[the father] did not have the right to divest himself of his earning ability at the expense of [the mother] and his two minor children.  [The father] may wish to undertake and pursue and continue to pursue his acquisition of a medical doctorate degree, but he must also continue to pay his child and spousal support.'"  (*Id*. at p. 1639; see *Regnery*, *supra*, 214 Cal.App.3d at pp. 1373-1376 [parent quitting job and failing to find replacement employment for two years supported trial court's decision imputing income based on earnings at prior job].)

In *Eggers*, the parent's employer fired him for sending sexually inappropriate e-mails to a coworker.  (*Eggers*, *supra*, 131 Cal.App.4th at p. 698.)  Although the parent did not quit his job to pursue other endeavors, the trial court nonetheless relied on *Padilla* and *Ilas* to impute earnings because the court viewed the termination as more "voluntary" than "involuntary" based on the reason for the termination.  (*Id*. at pp. 700-701.)  We reversed because the parent's misconduct was not equivalent to voluntarily divesting himself of earning capacity required to pay child support, as in *Padilla* and *Ilas*.  In reaching that conclusion, we acknowledged trial courts have the discretion to impute earnings from a prior job when a parent's conduct in quitting the job "reflect[s] a divestiture of resources required for child support obligations."  We also recognized "[t]here may be situations where the supporting parent's conduct warrants considering a claimed involuntary termination of employment as actually voluntary for purposes of determining the parent's earning capacity."  (*Ibid*.)  We concluded, however, the parent's conduct in *Eggers* did not rise to that level.  (*Id*. at p. 701.)

Here, we conclude the evidence supports the trial court's decision to treat Charles's termination as voluntary and impute income to him at his November 2009 earnings level. Charles did not simply exercise poor judgment on a collateral matter that resulted in his termination; rather, he engaged in misconduct with the intent to avoid his child support obligations and refused to accept Amcor's reasonable conditions that would have allowed him to keep his well-paying job despite his malfeasance. In deciding to impute income to Charles, the trial court found he had the opportunity to keep his job, Amcor fired him because he refused to cooperate with its investigation into his diversion of business and improper commission sharing agreements, his misconduct "was part and parcel of his attempt to lower Child and Spousal Support," and imputing income to Charles was in the child's best interests. Substantial evidence supports each of these findings.

Sarnecki testified Charles approached Amcor in early 2009 and asked for help in reducing his income because he would soon become embroiled in a bitter divorce. Amcor refused Charles's request to conceal some of his compensation from Connie, and in the months following that refusal Charles's sales volume dropped significantly. Charles eventually admitted to Sarnecki and other Amcor executives he had done a lot of "'stupid stuff'" to reduce his income and try to settle his divorce, including diverting some of his Amcor customers to Value Added and entering into improper commission sharing agreements with another salesman on at least three accounts. Finally, Sarnecki testified Amcor terminated Charles when he failed to cooperate with the investigation into his misconduct and provide information about the business he diverted. Charles testified he made the foregoing statements to Sarnecki and other Amcor executives, but claimed the statements were not true, explaining Amcor's investigators told him he had to make the statements if he wanted to keep his job. The trial court necessarily resolved this conflict in the evidence in Connie's favor, and we must defer to the trial court's resolution of that conflict. (*Leung*, *supra*, 55 Cal.4th at p. 308.)

19

Charles cites several cases that hold a trial court's decision to impute income to a parent must be based on evidence of a current opportunity to earn the income to be imputed, and evidence establishing merely that a parent continues to possess the skills and qualifications that made it possible to earn a certain salary in the past is not sufficient. (See, e.g., *Mendoza*, *supra*, 182 Cal.App.4th at pp. 685-686; *Berger*, *supra*, 170 Cal.App.4th at pp. 1079-1080; *Bardzik*, *supra*, 165 Cal.App.4th at pp. 1308-1309; *Smith*, *supra*, 90 Cal.App.4th at pp. 82-83; *Vargas*, *supra*, 70 Cal.App.4th at p. 1127; *Cohn*, *supra*, 65 Cal.App.4th at pp. 929-931.) None of these cases, however, involves a parent who engaged in intentional misconduct to reduce his reported income and support obligations, and then refused to cooperate with the employer when it nonetheless offered him the opportunity to keep his job despite his malfeasance.

The two cases Charles cites that resemble our case are *Berger* and *Bardzik* because they involved parents who voluntarily left a job. In *Berger*, we affirmed the trial court's decision refusing to impute income to a father based on a well-paying job he held five years earlier because there was no evidence he had the present opportunity to earn the same income. In seeking to impute that income to the father, the mother did not argue the court had discretion to impute income from that previous job based on *Padilla*, *Ilas*, and *Eggers*. Moreover, the father had quit his well-paying job to start a new business a year *before* the couple separated, and there was no evidence suggesting he did so in anticipation of a divorce or to divest himself of resources he would later need to meet his child support obligations. (*Berger*, *supra*, 170 Cal.App.4th at pp. 1074-1075, 1079-1080.)

Similarly, in *Bardzik,* we affirmed the trial court's decision refusing to impute income to a mother based on a job from which she had retired a year earlier because there was no evidence showing whether there were current opportunities for her to earn the same income. The father sought to impute income to the mother solely based on the salary she had earned before retirement because she had retired at the relatively

20

young age of 42. The father, however, did not rely on *Padilla*, *Ilas*, and *Eggers*, which granted the trial court discretion to impute earnings from a prior job when the circumstances showed the parent deliberately abandoned the employment necessary to pay child support. In addition, there was no evidence the mother retired to divest herself of resources required to pay child support. (*Bardzik*, *supra*, 165 Cal.App.4th at pp. 1296-1298, 1308-1309.) Because *Berger* and *Bardzik* affirmed the trial court's exercise of its discretion and did not address the rule we apply here, neither case establishes the trial court abused its discretion by imputing income to Charles at the level he earned in November 2009.

Finally, Charles contends the reasons for his termination and his motivation for acting as he did are irrelevant to the trial court's decision whether to impute income to Charles. To support this contention, Charles cites the following statement we made in *Padilla*: "A parent's motivation for reducing available income is irrelevant when the ability and opportunity to adequately and reasonably provide for the child are present." (*Padilla*, *supra*, 38 Cal.App.4th at p. 1218.) Charles, however, takes this sentence out of context, ignores our later clarification of this sentence in *Bardzik*, and ignores the proper role motivation may play in the earning capacity analysis.

In *Padilla*, we declared a trial court's authority to impute income based on earning capacity did not require a finding the parent acted in bad faith in reducing or eliminating his or her income. (See *Padilla*, *supra*, 38 Cal.App.4th at pp. 1217-1218.) In *Bardzik*, we explained this statement from *Padilla* was "exuberant dicta" and "[did not stand] for the blanket proposition that motivation is *per se* irrelevant" because "[a]n inflexible rule of per se irrelevance . . . is inconsistent with Family Code section 4058, subdivision (b)'s treatment of earning capacity as a discretionary matter considering the best interests of the children." (*Bardzik*, *supra*, 165 Cal.App.4th at p. 1311, original italics.) Other cases have explained section 4058, subdivision (b), explicitly authorizes a court to consider earning capacity in all cases consistent with the child's best interests

21

regardless of whether the parent acted in bad faith, but deliberate avoidance of family responsibilities remains a "'significant factor'" in deciding whether to consider earning capacity in lieu of actual income. (See, e.g., *Smith*, *supra*, 90 Cal.App.4th at p. 81; *Ilas*, *supra*, 12 Cal.App.4th at pp. 1638-1639.) Accordingly, the trial court properly considered Charles's declared intent to reduce his income when it decided to impute income to Charles based on his November 2009 earnings level.

3. The Trial Court's Denial of Connie's Motion to Set Aside Did Not Bar Her Counter Request to Increase Support

Charles contends the trial court erred in granting Connie's counter request to increase his support obligations because her earlier motion to set aside the March 2011 order modifying support raised the same issues and she failed to appeal the court's denial of that motion. According to Charles, the doctrine of res judicata prevented Connie from relitigating the propriety of the March 2011 order. We disagree. Connie's counter request did not seek to relitigate the merits of the March 2011 order, but rather to increase support based on changed circumstances.

"'As generally understood, "[t]he doctrine of *res judicata* gives certain *conclusive effect* to a *former judgment* in subsequent litigation involving the same controversy." [Citation.] The doctrine "has a double aspect." [Citation.] "In its primary aspect," commonly known as claim preclusion, it "operates as a bar to the maintenance of a second suit between the same parties on the same cause of action. [Citation.]" [Citation.] "In its secondary aspect," commonly known as collateral estoppel, "[t]he prior judgment . . . 'operates'" in "a second suit . . . based on a different cause of action . . . 'as an estoppel or conclusive adjudication as to such issues in the second action as were actually litigated and determined in the first action.' [Citation.]" [Citation.] "The prerequisite elements for applying the doctrine to either an entire cause of action or one or more issues are the same: (1) A claim or issue raised in the present action is identical to a claim or issue litigated in a prior proceeding; (2) the prior proceeding resulted in a

22

final judgment on the merits; and (3) the party against whom the doctrine is being asserted was a party or in privity with a party to the prior proceeding. [Citations.]"' [Citation.]" (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 797, original italics.)

Here, Connie's motion to set aside the March 2011 support order was based on her contention Charles lied when he claimed his income had been drastically reduced because he had lost his largest customer. According to Connie, Charles's income remained the same because he had diverted some of his customers to Value Added and another salesman at Amcor, and therefore the Amcor pay stubs on which the trial court relied in making the March 2011 order did not accurately state Charles's income. The court denied Connie's motion because she failed to show the amount of Charles's income not reflected in his pay stubs. The court explained it appeared Charles was attempting to conceal income, but the court could not grant Connie's motion because she failed to present evidence showing Charles succeeded in his efforts to hide his actual income.

In contrast, Connie based her request to increase Charles's support obligations on circumstances occurring after the court issued its March 2011 order. Connie learned Amcor had fired Charles and filed a lawsuit against him.[7] According to Connie, that lawsuit revealed Charles had been engaging in misconduct designed to conceal his reported income and thereby reduce his support obligations. Connie argued the trial court should impute income to Charles in the amount he earned when the court made its original support order. The trial court granted this request because it found Charles lost his job based on the scheme he concocted to conceal his true income and imputing income to Charles at his previous earnings level was in the child's best interest.

---

[7]     Section 213 authorized the declaration Connie filed in response to Charles's request to further reduce his support obligations to include a counter request seeking affirmative relief on her behalf. (See *In re Marriage of Seagondollar* (2006) 139 Cal.App.4th 1116, 1127.)

23

Accordingly, the issues the trial court decided on Connie's two requests are far from identical. The motion to set aside required Connie to prove Charles's income on the date the court issued the March 2011 order differed from Charles's claimed income. In other words, Connie had to prove Charles committed a fraud on the court. The counter request to increase support required Connie to prove Charles had the ability and opportunity to keep his job at Amcor and imputing the income Charles previously earned at Amcor was in the child's best interest. Although the two requests were based on the same basic set of underlying facts, Charles provides no authority or explanation to show the requests involved the identical issue. Accordingly, the doctrine of res judicata does not apply.

## III

### DISPOSITION

The order is affirmed. Connie shall recover her costs on appeal.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


THOMPSON, J.


24

Filed 11/26/14

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of CHARLES D. and CONNIE A. McHUGH. | |
| CHARLES D. McHUGH, | G048551 |
| Appellant, | (Super. Ct. No. 09D008768) |
| v. | ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PARTIAL PUBLICATION; NO CHANGE IN JUDGMENT |
| CONNIE A. McHUGH, | |
| Respondent; | |
| ORANGE COUNTY DEPARTMENT OF CHILD SUPPORT SERVICES, | |
| Respondent. | |

It is ordered that the opinion filed in the above-entitled matter on October 30, 2014, is hereby MODIFIED as follows:

1. On page 2, the second sentence of the first paragraph, starting with "In opposing Charles's request," delete the phrase "for the admitted purpose of" and replace it with the word "to," delete the word "minimizing" and replace it with the word

_____

* Pursuant to California Rules of Court, rules 8.1005(b) and 8.1110, this opinion is certified for publication with the exception of part II.D.3.

"minimize," and delete the word "reducing" and replace it with the word "reduce" so the sentence reads as follows:

> In opposing Charles's request, respondent Connie A. McHugh countered by asking the trial court to increase support because Charles lost his job for diverting business from his employer to his father's competing company to minimize his reported income and reduce his support obligations.

2. On page 2, the third sentence of the first paragraph, starting with "Connie argued the court," delete the word "argued" and replace it with the word "asked," delete the word "should" and replace it with the word "to," insert the word "her" between the words "increase" and "support," and delete the phrase "his original job" and replace it with the phrase "the job he lost" so the sentence reads:

> Connie asked the court to increase her support based on Charles's income at the job he lost because Charles refused his employer's offer to retain him if he fully disclosed his misconduct and paid his employer restitution.

3. On page 2, the fourth sentence of the first paragraph, starting with "The trial court denied," delete the word "request" and replace it with the word "motion," and insert the phrase "the amount of child" between the words "reduce" and "support" so the sentence reads:

> The trial court denied Charles's motion to reduce the amount of child support and granted Connie's request to increase support by imputing income to Charles at the level he earned before engaging in his misconduct.

4. On page 4, the first sentence of the second paragraph, starting with "In November 2011," insert the phrase "set aside" between the words "Connie's" and "motion," and delete the phrase "to set aside" so the sentence reads:

> In November 2011, the trial court conducted an evidentiary hearing on Connie's set aside motion, but it continued the hearing on the other requests.

2

5.      On page 4, the second and third sentence of the second paragraph, starting with "At the hearing" and "Sarnecki explained," delete the phrase "At the hearing, the court received testimony from," delete the period at the end of the second sentence, and delete the phrase "Sarnecki explained" and replace it with the phrase "testified that" so the two sentences are combined into one that reads:

> Thomas Sarnecki, Amcor's Vice President of Workplace Relations and Employment Counsel, testified that Charles was one of Amcor's top salesmen earning between $137,000 and $597,000 per year during the period 2003 to 2009.

6.      On page 4, the fourth sentence of the second paragraph, starting with "In 2009," delete the phrase "was about to become embroiled in" and replace it with the word "faced" so the sentence reads:

> In 2009, Charles asked Amcor to help him reduce his income because he faced a bitter divorce and wanted to minimize his earnings.

7.      On page 4, the fifth sentence of the second paragraph, starting with "According to Sarnecki," delete the phrase "would not cooperate with any of" and replace it with the word "rejected" so the sentence reads:

> According to Sarnecki, Amcor told Charles it would reassign him to a lower paying position, but it rejected his other "more aggressive approach[es]," such as diverting some of his compensation.

8.      On page 4, the third sentence of the third paragraph, starting with "Sarnecki explained Amcor," delete the word "believed" and replace it with the word "accepted," delete the word "it" following the word "but," delete the phrase "investigating him and his accounts" and replace it with the phrase "an investigation," delete the word "the" from between the words "about" and "products," insert the word "recently" between the words "it" and "had," and delete the phrase "Amcor's records

3

showed the customer had not purchased anything in a couple of years" and replace it with the phrase "Amcor had no record of the transaction" so the sentence reads:

> Sarnecki explained Amcor initially accepted Charles's explanation because of his past faithful service, but began an investigation after one of Charles's customers asked Amcor about products it recently had purchased and Amcor had no record of the transaction.

9. On page 5, the first sentence of the first full paragraph, starting with "Sarnecki further testified," delete the phrase "Sarnecki further testified," and delete the word "believed" and replace it with the word "suspected" so the sentence reads:

> Amcor's investigators discovered Charles's father operated a competing business, Value Added Packaging & Printing, Inc. (Value Added), and the investigators suspected Charles had diverted some of Amcor's business to his father's business.

10. On page 5, the second sentence of the first full paragraph, staring with "The investigators also believed," delete the phrase "sales with," and delete the word "customers" and replace it with the word "transactions" so the sentence reads:

> The investigators also believed Charles used one of Amcor's other salesmen to close some of Charles's transactions, and then Charles and the other salesman would share the commission.

11. On page 10, the second sentence of the first paragraph, starting with "The parent seeking to impute," delete the phrase "the job if he or she applied" and replace it with the phrase "employment if it had been sought" so the sentence reads:

> The parent seeking to impute income, however, does not bear the burden to show the other parent would have obtained employment if it had been sought.

4

12. On page 13, the first sentence of the first full paragraph, starting with "Charles contends the trial court," delete the phrase "instead of taking his new, lower paying job" so the sentence reads:

> Charles contends the trial court erred in denying his request to reduce his support obligations because there is no substantial evidence to support a finding he had the opportunity to keep his job at Amcor.

13. On page 13, the second sentence of the first full paragraph, starting with "Without evidence showing," delete the word "showing," insert the word "initially" between the words "to" and "calculate," and delete the phrase "under the March 2011 order" so the sentence reads:

> Without evidence he could keep his Amcor job and continue earning at the same income level the court used to initially calculate his support, Charles contends the court erred in refusing to reduce his support obligations to an amount commensurate with his lower income.

14. On page 14, the second sentence of the first full paragraph, starting with "Charles also ignores," delete the phrase "but Amcor's records showed the customer had not purchased any products for at least two years" and replace it with the phrase "directly instead of Amcor" so the sentence reads:

> Charles also ignores Sarnecki's testimony that Amcor learned a customer recently had purchased Amcor products through Charles directly instead of Amcor.

15. On page 19, the sixth sentence of the second paragraph, starting with "The trial court necessarily," delete the word "necessarily," insert the word "evidentiary" between the words "this" and "conflict," delete the phrase "in the evidence," and delete the phrase "the trial court's resolution of that conflict" and replace it with the phrase "that implied finding" so the sentence reads:

5

The trial court resolved this evidentiary conflict in Connie's favor, and we must defer to that implied finding.

16. On page 20, the first sentence of the first paragraph, starting with "Charles cites several cases," delete the entire sentence and replace it with the following:

> Charles relies on several cases holding evidence of a current income opportunity is necessary to impute income, and evidence that a parent merely possesses the requisite skill and qualifications is not sufficient.

17. On page 20, the third sentence of the second paragraph, starting with "In seeking to impute," delete the phrase "In seeking to impute that income to the father" and replace it with the word "There," delete the phrase "did not" and replace it with the phrase "failed to," insert the word "trial" between the words "the" and "court," and delete the word "that" from between the words "from" and "previous" and replace it with the phrase "the father's" so the sentence reads:

> There, the mother failed to argue the trial court had discretion to impute income from the father's previous job based on *Padilla*, *Ilas*, and *Eggers*.

18. On page 21, the first and second complete sentences of the partial paragraph at the top of the page, starting with "The father, however," and "In addition," delete the phrase "the circumstances showed," insert the word "it" between the words "abandoned" and "the," delete the phrase "the employment necessary to pay child support," delete the period at the end of the first sentence, delete the phrase "In addition, there was" and replace it with the word "and," insert the word "showed" between the words "evidence" and "the," delete the phrase "to divest herself of resources required" and replace it with the phrase "so she could reduce her," and insert the word "payments" after the word "support" and before the period so the two sentences are combined into one that reads:

> The father, however, did not rely on *Padilla*, *Ilas*, and *Eggers*, which granted the trial court discretion to impute earnings from a prior job when

6

the parent deliberately abandoned it, and no evidence showed the mother retired so she could reduce her child support payments.

19. On page 21, the first sentence of the first full paragraph, starting with "Finally, Charles contends," delete the phrase "acting as he did" and replace it with the phrase "declining the opportunity to retain his job," and delete the word "Charles" at the end of the sentence and replace it with the word "him" so the sentence reads:

Finally, Charles contends the reasons for his termination and his motivation for declining the opportunity to retain his job are irrelevant to the trial court's decision whether to impute income to him.

20. On page 22, the first complete sentence of the partial paragraph at the top of the page, starting with "Accordingly, the trial court," delete the phrase "when it decided" and replace it with the phrase "in determining whether" and delete the phrase "to Charles" so the sentence reads:

Accordingly, the trial court properly considered Charles's declared intent to reduce his income in determining whether to impute income based on his November 2009 earning level.

21. On Page 2, the fifth sentence of the second paragraph, starting with "The trial court granted," delete the phrase "based on the scheme he concocted" and replace it with the phrase "in a scheme," insert a comma after the phrase "true income," delete the phrase "was in the child's best interest" and replace it with the phrase "served the best interest of his child" so the sentence reads:

The trial court granted this request because it found Charles lost his job in a scheme to conceal his true income, and imputing income to Charles at his previous earnings level served the best interest of his child.

These modifications do not change the judgment.

The Child Support Directors Association of California and the Orange County Department of Child Support Services request that our opinion be certified for

7

publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c), except for part II.D.3. We therefore PARTIALLY GRANT the requests and order the opinion published except for part II.D.3.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


THOMPSON, J.


8